2024-1593

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

THE MOSAIC COMPANY,
*Plaintiff-Appellee*

v.

UNITED STATES,
*Defendant-Appellee*

v.

PHOSAGRO PJSC, JSC APATIT, INDUSTRIAL
GROUP PHOSPHORITE, LLC,
*Defendants-Appellants*

---

Appeal from the United States Court of International Trade in
Case Nos. 1:21-cv-00117-JAR, 1:21-cv-00220-JAR,
1:21-cv-00221-JAR, Senior Judge Jane A. Restani

---

### OPENING BRIEF OF DEFENDANT-APPELLANT
### INDUSTRIAL GROUP PHOSPHORITE LLC

Jeremy William Dutra
Peter Koenig

**SQUIRE PATTON BOGGS (US) LLP**
2550 M Street, NW
Washington, DC 20037
202-626-6237

*Counsel to Industrial Group
Phosphorite LLC*

Dated: June 7, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1593 |
| **Short Case Caption** | Mosaic Company v. US |
| **Filing Party/Entity** | Industrial Group Phosphorite LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/07/2024

Signature: /s/ Jeremy W. Dutra

Name: Jeremy W. Dutra

**FORM 9. Certificate of Interest**

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Industrial Group Phosphorite LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

I.      STATEMENT OF RELATED CASES .............................................1

II.     JURISDICTIONAL STATEMENT ................................................1

III.    STATEMENT OF THE ISSUES ....................................................2

IV.     STATEMENT OF THE CASE .......................................................2

V.      SUMMARY OF THE ARGUMENT .............................................6

VI.     ARGUMENT .................................................................................7

        A.    Standard of Review .............................................................7

        B.    The provision of natural gas by Gazprom and Rosneft is not
              *de facto* specific.................................................................8

        C.    Commerce failed to select a lawful and reasonable natural
              gas benchmark consistent with market principles and
              reflective of prevailing market conditions in Russia. ........13

              1.    Commerce failed to comply with its regulatory
                    requirements by improperly using an external Tier 3
                    benchmark without first undertaking the statutorily
                    required step of evaluating whether the government
                    price for natural gas reflects market principles........14

              2.    Commerce's use of a European benchmark price for
                    natural gas, without adjustment, violates the statutory
                    requirement to assess the adequacy of remuneration in
                    relation to the market conditions in Russia..............17

VII.    CONCLUSION............................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Am. Silicon Techs. v. United States*, 110 F. Supp. 2d 992 (CIT 2000).....................8

*Amerikohl Min., Inc. v. United States*, 899 F. 2d 1210 (Fed. Cir. 1990)................17

*Atl. Sugar, Ltd. v. United States*, 744 F. 2d 1556 (Fed. Cir. 1984) .....................8, 17

*Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380 (CIT 2021) ..............14

*JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011) .............................7

*The Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 (CIT 2023).....................13

*Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019)..............................17

*Nucor Corp. v. United States*, 34 CIT 70 (2008)......................................................8

*PT. Zinus Glob. Indonesia v. United States*, 628 F. Supp. 3d 1252 (CIT 2023).....13

*RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288
    (CIT 2015) .........................................................................................................17

*Viraj Group v. United States*, 476 F.3d 1349 (Fed. Cir. 2007) ................................8

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................................8

19 U.S.C. § 1677(5)(A) ................................................................................................8

19 U.S.C. § 1677(5)(E)(iv) ...........................................................................13, 17, 20

19 U.S.C. § 1677(5A)(D)............................................................................................10

19 U.S.C. § 1677(5A)(D)(i)..........................................................................................9

19 U.S.C. § 1677(5A)(D)(iii)..................................................................................9, 10

19 U.S.C. § 3512(d) ....................................................................................................11

**Regulations**

19 C.F.R. § 351.511 ....................................................................................................13

19 C.F.R. § 351.511(a)(2)(iii)......................................................................................13

**Legislative and Administrative Materials**

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348 (Dep't of
    Commerce Nov. 25, 1998)................................................................8, 12, 14, 16

Uruguay Round Agreements Act, Statement of Administrative
    Action, H.R. Doc. No. 103–216 (1994) reprinted in 1994
    U.S.C.C.A.N. 4040 ............................................................................................11

**Other Sources**

Merriam-Webster's Collegiate Dictionary (10th ed. 1993)....................................12

Defendant-Appellant Industrial Group Phosphorite LLC ("EuroChem") respectfully submits this opening brief in support of its appeal from the Judgment of the U.S. Court of International Trade ("CIT") in *The Mosaic Company v. United States*, Consol. Ct. No. 1:21-cv-00117-JAR (CIT Jan. 19, 2024), Appx73-74, and certain aspects of the CIT's decision in *The Mosaic Company v. United States*, Slip Op. 22-103, Consol. Ct. No. 1:21-cv-00117-JAR (CIT Sept. 2, 2022), Appx1-42, made final by the CIT Judgment.

## I.    STATEMENT OF RELATED CASES

Counsel for EuroChem is unaware of any other appeal from the same civil actions previously filed before this or any other appellate court. Counsel for EuroChem is not currently aware of any other case that would be affected by the Court's decision in this appeal.

## II.    JURISDICTIONAL STATEMENT

This is an appeal from the final judgment of the CIT in *The Mosaic Company v. United States*, entered on January 19, 2024. Appx73-74. The CIT exercised jurisdiction under 28 U.S.C. § 1581(c). On March 19, 2024, within sixty days of the CIT's final judgment, EuroChem timely filed its notice of appeal pursuant to Federal Circuit Rule 4. This Court has jurisdiction to review the CIT's final judgment under 28 U.S.C. § 1295(a)(5).

## III.    STATEMENT OF THE ISSUES

This appeal raises the following issues:

1.    Whether the CIT erred in affirming the U.S. Department of Commerce's ("Commerce") *de facto* specificity analysis for the provision of natural gas at less than adequate remuneration ("LTAR"), which is unsupported by substantial evidence and is otherwise contrary to law.

2.    Whether the CIT erred in affirming Commerce's benchmark analysis of the provision of natural gas at LTAR, which is not supported by substantial evidence and otherwise is contrary to law.

## IV.    STATEMENT OF THE CASE

On July 23, 2020, Commerce initiated a countervailing duty investigation into imports of phosphate fertilizers from Russia in response to a petition from The Mosaic Company ("Petitioner").  Appx709-11.  Among the allegations Commerce investigated was the provision of natural gas for LTAR.  Appx706-08.  On August 4, 2020, Commerce selected EuroChem and PhosAgro as mandatory respondents ("Respondents").  Appx714.

Through questionnaires issued to the Government of Russia ("GOR"), Commerce sought specific information on the natural gas market in Russia, including sector-specific consumption data.    Appx731-56;  Appx1021-25; Appx1782-89.  The GOR responded that it did not maintain statistics on industrial

consumers that purchase natural gas, but in supplemental questionnaire responses, provided information from the fertilizer industry and summarized information contained in annual reports published by Gazprom, the largest producer and seller of natural gas in Russia.  Appx747; Appx1024; Appx1029-33; Appx1785-89.  The data GOR provided showed the following natural gas consumption breakdown:

| Industry | 2019 |
|---|---|
| Electricity and Heat Generation | 35% |
| Household Consumers | 11% |
| Oil Industry | 9% |
| Housing and Utilities | 8% |
| Metals Industry | 6% |
| Other | 31% |

Appx758; Appx819; Appx1029-33; Appx1786.  Included in the "Other" category, was the fertilizer industry, which, based on consumption data from the fertilizer industry, used only 4.7% of the total natural gas consumed in Russia in 2019. Appx1024; Appx1029-33.

On November 2, 2020, both Petitioner and Respondents submitted proposed benchmark data to Commerce for evaluating any benefit conferred by the provision of natural gas.  Respondents jointly provided benchmark prices for natural gas from independent Russian natural gas producers, and the Brattle Report that, *inter alia*, analyzed whether Gazprom prices were set in accordance with market principles. Appx1669-1728.  Petitioner submitted natural gas pricing for Organisation for Economic Cooperation & Development ("OECD") and European Union ("EU")

member countries sourced from the International Energy Agency ("IEA") (the "IEA data"). Appx1034; Appx1039-40; Appx1486-88.

On November 30, 2020, Commerce published its preliminary affirmative determination along with an issues and decision memorandum. Appx1808-10; Appx1790-87. On February 16, 2021, Commerce published its final affirmative determination along with an issues and decision memorandum. Appx1884-87; Appx1811-83. Relevant to this appeal, Commerce determined that Russian producers of phosphate fertilizers received countervailable subsidies by purchasing natural gas from Gazprom and Rosneft for less than adequate remuneration. Appx1818-19; Appx1797; Appx1806. In making its determination, Commerce found that Gazprom and Rosneft are governmental authorities under 19 U.S.C. § 1677(5)(B)(i) such that natural gas sold by Gazprom and Rosneft to the Respondents constitutes a financial contribution under 19 U.S.C. § 1677(5)(D)(iii). Appx1840-42; Appx1845-47.

While finding no evidence that Gazprom and Rosneft sell natural gas to the fertilizer industry in a manner that is *de jure* specific, Commerce found that the provision of natural gas by these entities is *de facto* specific because the agrochemical industry was a predominant user of natural gas when compared to other industrial sectors in Russia. Appx1854-55; Appx1818-19; Appx1800.

Commerce provided no benchmark or other methodology to determine who is a "predominant" user, to support its claim.

To determine the existence and amount of any benefit conferred by the provision of natural gas by Gazprom and Rosneft, Commerce employed a "Tier Three" benchmark using the IEA data Petitioner provided.    Appx1863-64. Commerce rejected a "Tier One" benchmark as unavailable by asserting that the prices of private suppliers of natural gas in Russia "reflect the significant distortion resulting from the government's involvement in the market."    Appx1860; Appx1802-03.

Commerce found Petitioner's IEA data was unavailable as a "Tier Two" benchmark because the unidirectional nature of the gas pipelines meant that such price would not be available to purchasers in Russia.  Appx1861-62; Appx1803.

Commerce refused to evaluate whether the government price was set in accordance with market principles and further rejected the use of private Russian natural gas supplier pricing as a "Tier Three" benchmark because the "Russian natural gas market is distorted" such that "the prices charged by private suppliers cannot provide a basis for determining whether Gazprom's prices are market-based." Appx1863-64; Appx1804-05.

On April 7, 2021, Commerce published a CVD order on phosphate fertilizers from Russia following an affirmative injury determination by the U.S. International Trade Commission.  Appx1888-90.

Respondents challenged the final CVD determination before the CIT, which affirmed Commerce's determination that the provision of natural gas for LTAR was *de facto* specific and affirmed Commerce's selection of the IEA data as a Tier Three benchmark.  Appx15; Appx24.  The CIT nevertheless remanded the matter to Commerce to, among other things, either remove the added value-added tax (VAT) and import duties from the natural gas benchmark price or offer further explanation for why, when tier one and tier two benchmark prices are rejected, it is reasonable to add additional VAT and import duties.  Appx26.

Commerce filed its remand results on December 30, 2022.  Appx1891.  The CIT again remanded certain aspects of the first remand results for further explanation or reconsideration.  Appx46-47.  Commerce filed its second remand results on October 11, 2023.  Appx1926.  The CIT sustained the second remand results and entered judgment.  Appx69-70; Appx73-74.  This appeal ensued.

## V.    SUMMARY OF THE ARGUMENT

Commerce's *de facto* specificity analysis for the provision of natural gas by Gazprom and Rosneft was flawed.  Commerce improperly limited its baseline comparison to only usage by industrial users, excluding other major consumers like

6

households and power generation that accounted for most natural gas consumption in Russia in 2019.  The statute requires Commerce to evaluate usage across the entire Russian economy, not just a subset.  The fertilizer industry only accounted for 4.7% of Russia's total natural gas consumption in 2019, which cannot be considered "predominant" usage.

Commerce also failed to conduct a proper Tier 3 benchmark analysis for the provision of natural gas for LTAR.  First, Commerce, while having the requisite data from the GOR, refused to comply with the statute (and its normal practice) to evaluate whether Gazprom's natural gas prices were set in accordance with market principles.   Second, Commerce's reliance on European natural gas prices, without adjustment for the comparative natural resource advantage Russia enjoys, violates the statutory requirement that the benchmark reflect the prevailing market conditions in Russia, the country subject to the investigation.

Commerce's final determination for the provision of natural gas at LTAR should be set aside because Commerce's specificity and benchmark findings were unsupported by substantial evidence and contrary to law.

## VI.   ARGUMENT

### A.   Standard of Review

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d

1378, 1381 (Fed. Cir. 2011) (citation omitted).   Because it does so "without

affording any deference to the Court of International Trade," this Court reviews the

record for substantial evidence and compliance with law.  *Am. Silicon Techs. v.

United States*, 334 F.3d 1033, 1037 (Fed Cir. 2003) (citation and internal quotation

marks omitted).

Substantial evidence requires that there "be a rational connection between the

facts found and the choice made."  *Nucor Corp. v. United States*, 34 CIT 70, 72

(2008) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168

(1962)).  The evidence must be "more than a mere scintilla," and must be "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion, taking into account the entire record, including whatever fairly detracts

from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F. 2d

1556, 1562 (Fed. Cir. 1984) (internal quotation marks omitted).

This Court "must reverse a determination that is unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  *Viraj Group v.

United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation

marks omitted); 19 U.S.C. § 1516a(b)(1)(B)(i).

### B.  The provision of natural gas by Gazprom and Rosneft is not *de facto* specific.

A subsidy is countervailable only if it is "specific" to an enterprise or industry,

versus generally available.  19 U.S.C. § 1677(5)(A); *Countervailing Duties; Final*

*Rule*, 63 Fed. Reg. 65,348, 65,357 (Dep't of Commerce Nov. 25, 1998).    If Commerce determines that a subsidy is not specific as a matter of law (*de jure*), Congress directed Commerce to evaluate whether that subsidy is specific as a matter of fact (*de facto*).  19 U.S.C. §§ 1677(5A)(D)(i), (iii).  A subsidy is *de facto* specific only under certain circumstances, including where "{a}n enterprise or industry is a predominant user of the subsidy."  19 U.S.C. § 1677(5A)(D)(iii).

Here, Commerce correctly determined that the provision of natural gas by Gazprom and Rosneft was not *de jure* specific.  It nevertheless found the provision of natural gas to be *de facto* specific because "the agro-chemistry industry is a predominant consumer of natural gas when compared to other industrial sectors." Appx1854.   Commerce's *de facto* specificity finding was contrary to law and unsupported by substantial evidence.

Fundamental to Commerce's error was narrowing its analysis to consider consumption of natural gas by just a subset of the Russian economy.  In so doing, Commerce excluded and ignored record data on consumption by electricity/heating, household, and housing/utility users.  Appx1854.  These excluded sectors of the Russian economy accounted for 54% of total natural gas consumption in Russia in 2019.  Appx819; Appx1786.  Disregarding the majority of natural gas consumption improperly distorted Commerce's specificity analysis.

9

The CIT accepted Commerce's exclusion of certain users from the specificity analysis as a reasonable exercise of Commerce "discretion to determine what predominant means in the context of § 1677(5A)(D)(iii)." Appx15. But Commerce's approach was not reasonable. Commerce never defined "predominant," nor a methodology or standard to apply, nor did it identify the statutory text supporting its decision to evaluate usage only among industrial users while excluding most natural gas consumers. Commerce's analysis was untethered from the statutory text and thus contrary to law and entitled to no deference.

The Tariff Act of 1930, as amended, requires Commerce to determine whether a subsidy is a "specific subsidy . . . to an enterprise or industry within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677(5A)(D). Further, a subsidy is *de facto* specific if such "{a}n enterprise or industry is a predominant user of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii). Nothing in the statute directs, let alone permits, Commerce to evaluate subsidy usage by an enterprise or industry among only a subset of users (*e.g.*, industrial users) within the overall economy in the subject country. The statute instead directs Commerce to evaluate whether an enterprise or industry is the predominant user of the subsidy within the jurisdiction of the government authority. Here, that required Commerce to evaluate whether the Russian fertilizer industry was the predominant user of natural gas as compared to all natural gas consumers within Russia.

That Commerce must compare subsidy usage by a particular enterprise or industry against all subsidy usage as opposed to a subset of users is confirmed by the purpose of the specificity test in countervailing duty investigations.  According to the authoritative Statement of Administrative Action ("SAA") to the Uruguay Round Agreements Act,[1] the specificity test is intended "to avoid the imposition of countervailing duties in situations where, because of the widespread availability <u>and use</u> of a subsidy, the benefit of the subsidy is spread <u>throughout the economy</u>." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–216 (1994) reprinted in 1994 U.S.C.C.A.N. 4040 (first emphasis in original and second emphasis added).  Making the comparison to only a subset of users within the overall economy, as Commerce did here, leads to the very result that the specificity test was meant to prevent; namely, improperly imposing countervailing duties on subsidies widely available and widely used in the subject country economy.

There is no dispute that natural gas is available to all in Russia and widely used by all sectors of the Russian economy, with no preferential terms to some users compared to others.  Gazprom's 2019 annual report confirms that consumers of

---

[1] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreement and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

natural gas in Russia include every aspect of the economy, including power generation, households, and industrial users. Appx819; Appx1786. There also is no dispute that the fertilizer industry—based on usage data from the fertilizer industry—accounted for a mere 4.7 percent of Russia's total natural gas consumption in 2019. Appx1024; Appx1030-33; Appx1786.

Merriam-Webster's defines "predominant" as "being most frequent or common." *Predominant*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993). In no reasonable interpretation can 4.7 percent usage be found to be "predominant." Indeed, the CIT recognized that the agrochemical industry, which Commerce found the fertilizer industry is a part, "purchased only a small percentage of Gazprom's total natural gas sales" when compared to all Russian users of natural gas. Appx15.

There was no statutory basis for Commerce to narrow its specificity analysis to only industrial users of natural gas. As Commerce recognized in its implementing regulations, where a subsidy is broadly available and widely used throughout an economy it cannot be found *de facto* specific. *Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,357. Commerce acknowledges that natural gas is broadly available in Russia and widely used by all sectors of the Russian economy. Appx1854. And the record confirms that the fertilizer industry in Russia consumed only 4.7% of Russia's total natural gas consumption. Appx1024; Appx1030-33; Appx1786. The provision of natural gas by Russian government authorities cannot

be *de facto* specific because "the actual users of the subsidy . . . is too large and diverse to reasonably be considered as a specific group, and there is no evidence of dominant or disproportionate use by any enterprise, group of enterprises, or industry. *The Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1317 (CIT 2023). Commerce's *de facto* specificity determination therefore should be rejected as unsupported by substantial evidence and contrary to law.

### C.    Commerce failed to select a lawful and reasonable natural gas benchmark consistent with market principles and reflective of prevailing market conditions in Russia.

The provision of a good by a government authority does not confer a benefit to the recipient unless the good is provided for LTAR.  Congress directed Commerce to evaluate the adequacy of remuneration in relation to the "prevailing market conditions" for the good being provided in the country subject to investigation.  19 U.S.C. § 1677(5)(E)(iv).  To effectuate the statutory purpose, Commerce must consider all factors and data on the record.  *PT. Zinus Glob. Indonesia v. United States*, 628 F. Supp. 3d 1252, 1263 (CIT 2023).

When evaluating the alleged provision of goods at LTAR, Commerce selects from a hierarchy of market benchmarks to measure the benefit received from the subsidy.  19 C.F.R. § 351.511.  In its final determination, Commerce used a Tier 3 benchmark, which requires Commerce to assess "whether the government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  In selecting the

specific benchmark, Commerce rejected any analysis of Russian prices, though required by regulation, and claimed that "the most appropriate proxy for a market-based natural gas benchmark to apply under Tier 3 is a regional, European OECD natural gas price." Appx1864. But European prices, as relied on by Commerce, do not reflect prevailing market conditions in Russia, a statutory requirement. Commerce's refusal to evaluate whether Russian prices are consistent with market principles and its failure to adjust its chosen external benchmark for conditions in Russia were unsupported by substantial evidence and contrary to law.

> **1.    Commerce failed to comply with its regulatory requirements by improperly using an external Tier 3 benchmark without first evaluating whether the government price for natural gas reflects market principles.**

Commerce should first have evaluated whether Gazprom's prices were consistent with market principles before considering use of an external benchmark. *E.g.*, *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1389 n.6 (CIT 2021) ("If Commerce determines that the government price is not consistent with market principles it will look to construct an external benchmark"). Commerce itself admits that it "normally assesses whether the prices charged by the government are set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." Appx1863-64; *see also Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,378.

14

Commerce summarily dismissed performing its normal analysis because the "Russian natural gas market is distorted and that as a result, the prices charged by private suppliers cannot provide a basis for determining whether Gazprom's prices are market-based." Appx1864. But Commerce engaged in a sleight-of-hand. Even if Commerce could not use transaction prices from independent provider Novatek for a Tier 3 benchmark, it does not excuse Commerce from evaluating Gazprom's prices to determine whether the government prices are set in accordance with market principles through an analysis of the government's price-setting philosophy and recovery of costs (including rates of return sufficient to ensure future operations).

And Commerce had the data to perform this required analysis. *E.g.*, Appx749-51; Appx1680-82; Appx1698-1708. For example, the GOR explained in its questionnaire response and provided documents demonstrating that the methodology for setting regulated natural gas prices primarily involves recovering all economic costs to sustain continuing operations and reasonable profits and does not provide for any industry-specific exceptions, exemptions, discounts, or preferences. Appx749-51. And Respondents provided the Brattle Report that conducted the analysis Commerce was required to perform, and demonstrated, based on record evidence, that Gazprom's prices cover all-in delivered costs with a reasonable rate of return. Appx1680-82; Appx1698-1708.

Commerce's excuse for not conducting its normal analysis under Tier 3—

distortion of the natural gas market because of government involvement through ownership interests in Gazprom and Rosneft; VAT, import duties, and export controls concerning natural gas; and regulated price schedule for residential natural gas customers—does not withstand scrutiny. Government-created distortion is a consideration only of whether Commerce can rely on in-country transaction prices from non-government entities as a Tier 1 benchmark. *See Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,377. Commerce fails to explain or justify why alleged distortion caused by government involvement in a market prevents it from evaluating the government price against market principles as required in a Tier 3 analysis. Indeed, Commerce's regulations explain that it is precisely those situations—where the government is the sole supplier and there are no world prices available for a Tier 2 analysis—that Commerce "<u>will</u> assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. *Id.* at 65,378 (emphasis added).

Commerce failed to provide any explanation for departing from its normal analysis under Tier 3 in which it first evaluates whether the government price is set in accordance with market principles before using an external third-country price benchmark, such as prices in Europe. Commerce's failure to address record

evidence and argument renders its Tier 3 benchmark determination contrary to law and unsupported by substantial evidence. *Nucor Corp. v. United States*, 927 F.3d 1243, 1251–52 (Fed. Cir. 2019).

> **2.     Commerce's use of a European benchmark price for natural gas, without adjustment, violates the statutory requirement to assess the adequacy of remuneration in relation to the market conditions in Russia.**

In its *Final Determination*, Commerce said "that the most appropriate proxy for a market-based natural gas benchmark to apply under 'Tier 3' is a regional, European OECD natural gas price." Appx1864. But Commerce failed to comply with the statutory requirement that the adequacy of remuneration "be determined in relation to prevailing market conditions for the good . . . being provided . . . <u>in the country which is subject to the investigation or review</u>." 19 U.S.C. § 1677(5)(E)(iv) (emphasis added). By statute, "{p}revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.*

Commerce accordingly had to explain how the benchmark it chose rationally relates to prevailing conditions in the <u>Russian market</u> and articulate the adjustments that are necessary and must be applied to achieve the statutory mandate. *See Amerikohl Min., Inc. v. United States*, 899 F. 2d 1210, 1213 (Fed. Cir. 1990) ("This court acknowledges that the word 'shall' is mandatory and not permissive."); *Atl. Sugar*, 744 F. 2d at 1560; *see also RZBC Group Shareholding Co., Ltd. v. United*

*States*, 100 F. Supp. 3d 1288, 1304 (CIT 2015) ("The agency must determine 'the adequacy of remuneration . . . in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review'"). If Commerce believed no adjustments were necessary, then it had to articulate and explain that decision. Commerce failed to do so.

Commerce admitted that its Tier 3 benchmark data—*i.e.*, "prices for natural gas sold in Europe"—reflect "the market dynamics in that market." Appx1866 (emphasis added). But this falls short of the requirement that Commerce, in this investigation, assess the adequacy of remuneration in relation to the prevailing market conditions in Russia, not Europe. Commerce made no effort to adjust its European natural gas price benchmark to reflect market conditions in Russia considering such factors as price, quality, availability, marketability, transportation, and other conditions of purchase or sale in Russia. That was clear legal error that by itself mandates rejection of Commerce's Tier 3 benchmark.

The statute required Commerce to account for the fact that the European OECD prices used by Commerce are driven by different supply and demand conditions than those that exist in Russia. *Compare* Appx1520-21 and Appx1494 *with* Appx737-38. In particular, the prices on which Commerce relied reflect export transactions among nations where natural gas demand far exceeds supply. Short supply conditions will generate higher market prices as compared to markets where

natural gas is in abundant supply relative to demand.  Data show that the European Union had to import a substantial—indeed, enormous—volume of natural gas in 2019, of which 44.7 percent was from Russia.  Appx1520-21; Appx1491-1504; Appx1520-21; Appx1541-42; Appx1550; Appx1620-21; Appx1626; Appx1642-43.  In stark contrast, Russia produced 737.7 billion cubic meters of natural gas in 2019 yet consumed just 436.6 billion cubic meters, *i.e.*, it only consumed 59.2% of the natural gas it produced while exporting 40.8%.  Appx737-38.   The fact that Russia exports huge quantities of natural gas to Europe—and Europe's substantial dependence on Russian natural gas—itself demonstrates the differing supply/demand conditions of the two markets.

Commerce faced the quintessential comparative advantage issue, which is not easily—or appropriately—dismissed.  Russia enjoys huge natural gas reserves, which make market conditions there unique among most nations.  Appx1683-86; Appx1491-1504;   Appx1520-21;   Appx1541-42;   Appx1550;   Appx1620-21; Appx1626; Appx1642-43.  It is not a condition brought on by any government policy, but by simple geographic resource fate.  Under the statute, Commerce had to adjust its Tier 3 benchmark to account for these market conditions.  In failing to do so, Commerce effectively countervailed the comparative advantage Russia enjoys in natural gas.

Commerce purports to justify its use of European prices as an appropriate Tier 3 benchmark, even though admittedly not available to Russian purchasers, because Europe and Russia are in the same region. Appx1864. But the statute does not have a "region" test and Commerce never explains or documents how being in the same region comports with Commerce's obligation to determine the adequacy or remuneration "in relation to prevailing market conditions for the good . . . being provided . . . in the country which is subject to the investigation." 19 U.S.C. § 1677(5)(E)(iv).

Section 1677(5)(E)(iv) provides no exception. Commerce <u>must</u> account for the prevailing market condition in Russia, which includes Russia's overwhelming natural advantage of natural gas reserves, in its benchmark selection regardless of whether government policies have any effects on market prices. Commerce cavalierly disregarded the bedrock undisputed economic principle of comparative advantage—the core foundation of trade and why market economies are best—without mentioning it or any evidence for doing so. Commerce's use of unadjusted European prices—a notoriously natural gas short market—as a benchmark is both contrary to the statutory mandate and not supported by substantial evidence.

## VII.  CONCLUSION

For the foregoing reasons, EuroChem respectfully requests that this Court: (1) vacate the CIT's decision affirming Commerce's *de facto* specificity determination

and Tier 3 benchmark determination for the provision of natural gas for LTAR; (2) find that Commerce's *de facto* specificity determination and Tier 3 benchmark determination for the provision of natural gas for LTAR were unsupported by substantial evidence and not in accordance with law; and (3) grant EuroChem such additional relief as the Court may deem just and proper.

Dated: June 7, 2024

Respectfully submitted,

*/s/ Jeremy W. Dutra*
Peter Koenig
peter.koenig@squirepb.com
Jeremy W. Dutra
jeremy.dutra@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

*Counsel for Industrial Group
Phosphorite LLC*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1593

**Short Case Caption:** Mosaic Company v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 4,392 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/07/2024

Signature: /s/ Jeremy W. Dutra

Name: Jeremy W. Dutra