Nos. 2024-1593, -1595

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

THE MOSAIC COMPANY,

*Plaintiff-Appellee,*

*v.*

UNITED STATES,

*Defendant-Appellee,*

*v.*

PHOSAGRO PJSC, JSC APATIT, INDUSTRIAL GROUP PHOSPHORITE, LLC,

*Defendants-Appellants.*

Appeals from the United States Court of International Trade, in Nos. 1:21-cv-00117-JAR, 1:21-cv-00220-JAR, and 1:21-cv-00221-JAR, Senior Judge Jane A. Restani

## NON-CONFIDENTIAL BRIEF FOR
## PLAINTIFF-APPELLEE THE MOSAIC COMPANY

DAVID J. ROSS
STEPHANIE E. HARTMANN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC  20037
(202) 663-6000

*Attorneys for Plaintiff-Appellee*
*The Mosaic Company*

July 17, 2024

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee The Mosaic Company certifies the following:

**1.    Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

The Mosaic Company

**2.    Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.    Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

The Mosaic Company ("Mosaic") is publicly-held.  No publicly-held company has a 10% or greater ownership interest in Mosaic.  Mosaic holds a 25% ownership interest in Ma'aden Wa'ad Al Shamal Phosphate Company ("MWSPC") in Saudi Arabia, with the remaining ownership interests in MWSPC held by the following Saudi companies:  Ma'aden (60%) and Saudi Basic Industries Corporation (15%)

**4.    Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

WILMER CUTLER PICKERING HALE AND DORR LLP:  Alexandra S. Maurer, Eliot Kim (former), Patrick J. McLain (former), Natan P.L. Tubman (former)

**5.    Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[ ] Yes (file separate notice; see below)    [X] No    [ ] N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6.    Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  July 17, 2024

/s/ David J. Ross
DAVID J. ROSS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC  20037
(202) 663-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF AUTHORITIES ..................................................................vi

STATEMENT OF RELATED CASES .................................................1

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .....................................................2

STATEMENT OF ISSUES ON APPEAL ...........................................3

STATEMENT OF THE CASE ..............................................................3

STATEMENT OF FACTS .....................................................................4

    A.    Legal Framework ................................................................4

    B.    Administrative Background ...............................................6

        1.    Initiation and Pre-Preliminary Developments ............6

        2.    Preliminary Determination.........................................8

        3.    Final Determination ................................................13

        4.    CIT Proceeding in *Mosaic I* ....................................15

SUMMARY OF THE ARGUMENT ...................................................17

ARGUMENT .......................................................................................18

I.    STANDARD OF REVIEW..................................................................18

II.    COMMERCE'S *DE FACTO* SPECIFICITY DETERMINATION FOR THE
NATURAL GAS FOR LTAR PROGRAM WAS SUPPORTED BY
SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE
WITH LAW ..................................................................................20

    A.    EuroChem Waived Its Arguments Regarding The
Interpretation Of "Predominant User" In
§ 1677(5A)(D)(iii)...........................................................21

    B.    Commerce's Interpretation Of § 1677(5A)(D)(iii) Is
Reasonable.......................................................................22

    C.    Substantial Evidence Supports Commerce's Finding That
The Agrochemical Industry Is A "Predominant User" Of
The Subsidy .....................................................................26

III.   COMMERCE'S BENEFIT DETERMINATION FOR THE NATURAL GAS
       FOR LTAR PROGRAM WAS SUPPORTED BY SUBSTANTIAL
       EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW ............................28

       A.   EuroChem Waived Its Arguments Regarding
            Commerce's Purported Obligation To Evaluate Whether
            Gazprom's Prices For Natural Gas Reflect Market
            Principles ............................................................................................28

       B.   Commerce's Application Of Its Tier Three Benchmark
            Regulation, § 351.511(a)(2)(iii), Was Reasonable,
            Supported By Substantial Evidence, And Otherwise In
            Accordance With Law..........................................................................29

       C.   Commerce Was Not Obligated To Adjust The IEA Data
            To Account For Market Conditions In Russia ....................................33

CONCLUSION ....................................................................................................35

CERTIFICATE OF SERVICE

CERTIFICATE OF CONFIDENTIAL MATERIAL

CERTIFICATE OF COMPLIANCE

| Br. Page | Confidential Word | Description | Redaction Label |
|---|---|---|---|
| 10 | ███████ | Business Proprietary Information Released under APO | # |
| 10 | ██████ | Business Proprietary Information Released under APO | # |
| 10 | ████ | Business Proprietary Information Released under APO | # |
| 10 | █████ | Business Proprietary Information Released under APO | # |
| 10 | ██████ | Business Proprietary Information Released under APO | # |
| 10 | █████ | Business Proprietary Information Released under APO | # |
| 10 | ██████ | Business Proprietary Information Released under APO | # |
| 10 | ██████ | Business Proprietary Information Released under APO | # |
| 10 | ██████ | Business Proprietary Information Released under APO | # |

| 10 | ███████ | Business Proprietary Information Released under APO | # |
|----|---------|---------------------------------------------------|---|
| 10 | ███████ | Business Proprietary Information Released under APO | # |
| 10 | █████ | Business Proprietary Information Released under APO | # |
| 10 | ██████ | Business Proprietary Information Released under APO | # |
| 10 | ███████ | Business Proprietary Information Released under APO | # |
| 10 | ███████ | Business Proprietary Information Released under APO | # |
| 10 | ███████ | Business Proprietary Information Released under APO | # |

## CONFIDENTIAL MATERIAL OMITTED

The material omitted from page the preceding chart and from page 10 contains Business Proprietary Information released under an administrative protective order.

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (CIT 2001) ............................................................................................24

*Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir. 2017) ...........21, 28

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015)....................................................35

*Clearon Corp. v. United States*, 800 F. Supp. 2d 1355 (CIT 2011) ......................19

*Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197 (1938)..................18

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) .........................19

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ..........................................................................................19

*Downhole Pipe & Equipment, LP v. United States*, 776 F.3d 1369 (Fed. Cir. 2015).............................................................................18

*Essar Steel, Ltd. v. United States*, 753 F.3d 1368 (Fed. Cir. 2014)........................20

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014).................................................................................1

*Fuwei Films (Shangdong) Co. v. United States*, 791 F. Supp. 2d 1381 (CIT 2011) .........................................................................20

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997).....................19

*Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.Ş. v. United States*, 459 F. Supp. 3d 1341 (CIT 2020)....................................................35

*Hylete LLC v. Hybrid Athletics, LLC*, 931 F.3d 1170 (Fed. Cir. 2019) .................20

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345 (CIT 2021)....................................................34

*Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984).............................................................................19

*Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293 (CIT 2017) ....................................................................................34

*Mitsubishi Heavy Industries, Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001)............................................................................19

*National Ass'n of Mirror Manufacturers v. United States*, 696 F. Supp. 642 (CIT 1988) ....................................................................19

*Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396 (Fed. Cir. 2014)............................................................................18

*POSCO v. United States*, 353 F. Supp. 3d 1357 (CIT 2018)...................................34

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014)......................................................................21, 29

*Rebar Trade Action Coalition v. United States I*, 389 F. Supp. 3d 1371 (CIT 2019) ....................................................................35

*Rhone Poulenc, Inc. v. United States*, 710 F. Supp. 341 (CIT 1989) .....................20

*RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288 (CIT 2015) ....................................................................34

*USEC Inc. v. United States*, 259 F. Supp. 2d 1310 (CIT 2003) ............................19

*Xi'an Metals & Minerals Import & Export Co. v. United States*, 50 F.4th 98 (Fed. Cir. 2022) ........................................................20

## STATUTES AND RULES

19 U.S.C.
    § 1516a................................................................................18
    § 1671 ...................................................................................1
    § 1677 ......................... 1, 4, 5, 6, 13, 14, 15, 21, 22, 23, 25, 33, 34

28 U.S.C.
    § 1295 ...................................................................................2
    § 1581 ...................................................................................2
    § 2637 ....................................................................19, 21, 28

19 C.F.R.

§ 351.502 .................................................................................25

§ 351.511 ........................................... 4, 5, 7, 11, 12, 29, 30, 32

Rule 47.5 .................................................................................1

## REGULATORY MATERIALS

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ...........................................................................25, 30

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020)...............................12

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Rules of this Court, counsel for Plaintiff-Appellee The Mosaic Company ("Mosaic") makes the following statement:

1.      No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.      No other action pending before the United States Court of International Trade ("CIT") may be directly affected by the Court's disposition of this appeal.

## INTRODUCTION

This case concerns Commerce's countervailing duty ("CVD") investigation of phosphate fertilizers from the Russian Federation and the U.S. Department of Commerce's ("Commerce") authority to enforce the CVD laws.

CVDs are "a remedial measure that provides relief to domestic manufacturers by imposing duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014) (citing 19 U.S.C. § 1671(a)).  A countervailable subsidy exists where a government authority provides a financial contribution that confers a benefit to the recipient and is specific to an enterprise or industry or group of enterprises or industries.  19 U.S.C. § 1677(5)-(5A).

In the underlying investigation, Commerce countervailed a range of subsidies that the Government of Russia ("GOR") provides to Russian producers of phosphate fertilizers. The most significant subsidy program, as applied to Appellant Industrial Phosphorite LLC ("Phosphorite"), is the GOR's Provision of Natural Gas for Less than Adequate Remuneration ("LTAR"). Phosphorite challenges Commerce's specificity and benefit findings with respect to this program.

## JURISDICTIONAL STATEMENT

This matter is an appeal of the final decision issued by the CIT in *The Mosaic Company v. United States*, Consol. Ct. No. 21-117, affirming Commerce's second remand redetermination pursuant to court order. Appx73-74. The CIT had jurisdiction pursuant to 28 U.S.C. § 1581(c). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5). The CIT issued the first decision remanding to Commerce on September 2, 2022. *See* Appx1-42 ("*Mosaic I*"). The CIT issued the second decision remanding to Commerce on July 11, 2023. *See* Appx43-65 ("*Mosaic II*"). The CIT issued the final decision and order from which this appeal was taken on January 19, 2024. *See* Appx66-72.

## STATEMENT OF ISSUES ON APPEAL

1. Whether Commerce's finding that the Provision of Natural Gas LTAR program is *de facto* specific is supported by substantial evidence and otherwise in accordance with law.

2. Whether Commerce's selection of a benchmark to measure the adequacy of remuneration for the Provision of Natural Gas for LTAR program is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF THE CASE

This appeal arises from Commerce's final determination in the countervailing duty investigation of Phosphate Fertilizers From the Russian Federation, published in the Federal Register on February 16, 2021. *Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), P.R. No. 418, ECF No. 24-4 ("*Final Determination*"), and accompanying Issues and Decision Memorandum, P.R. No. 405, ECF No. 24-5 ("IDM"). The countervailing duty order was published in the Federal Register on April 7, 2021. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021), P.R. No. 425.

# STATEMENT OF FACTS

## A.    Legal Framework

Under section 771(5)(B) of the Tariff Act of 1930, as amended (the "Act"), a countervailable subsidy exists if Commerce finds the following three elements: (1) a foreign government authority provides a "financial contribution"; (2) a "benefit" is thereby conferred upon the recipient (here, Phosphorite); and (3) the subsidy is "specific" to an enterprise, industry, or group of enterprises or industries. 19 U.S.C. § 1677(5)-(5A).

Section 771(5)(E) of the Act addresses the issue of "benefit." It states that "{a} benefit shall normally be treated as conferred where there is a benefit to the recipient, including … (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration … ." 19 U.S.C. § 1677(5)(E). Section 1677(5)(E)(iv) does not define what it means for goods or services to be provided for "less than adequate remuneration," but Commerce has enacted regulations setting out a three-tier hierarchical approach for measuring the adequacy of remuneration. 19 C.F.R. § 351.511(a)(1).

First, under tier one, Commerce seeks to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. 19 C.F.R. § 351.511(a)(2)(i). Next, if market-determined prices are not available,

Commerce seeks to measure the adequacy of remuneration by comparing the government price to a "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." *Id.* § 351.511(a)(2)(ii).  This is a tier two benchmark.  Finally, if there is no world market price available to purchasers in the country in question, then under tier three, Commerce will seek to measure the adequacy of remuneration "by assessing whether the government price is consistent with market principles." *Id.* § 351.511(a)(2)(iii).

Section 771(5A)(D) of the Act addresses the issue of "specificity."  Under section 771(5A)(D)(i) of the Act, a subsidy is *de jure* specific if the authority providing the subsidy "expressly limits access to the subsidy to an enterprise or industry{.}"  19 U.S.C. § 1677(5A)(D)(i).  Under section 771(5A)(D)(iii) of the Act, a subsidy is *de facto* specific if (1) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (2) An enterprise or industry is a predominant user of the subsidy; (3) An enterprise or industry receives a disproportionately large amount of the subsidy; or (4) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.  *Id.* § 1677(5A)(iii)(I)-(IV).  Finally, the statute states that "any reference to

an enterprise or industry … includes a group of such enterprises or industries." *Id.* § 1677(5A).

### B. Administrative Background

### 1. Initiation and Pre-Preliminary Developments

On June 26, 2020, Mosaic filed a Petition with Commerce and the U.S. International Trade Commission alleging that the phosphate fertilizer industry in the United States was materially injured or threatened with material injury by reason of imports of subsidized phosphate fertilizers from Russia. *See Phosphate Fertilizers from Morocco and Russia, Petitions for the Imposition of Countervailing Duties* (June 26, 2020), P.R. Nos. 2-8, C.R. Nos. 2-8 ("Petition"), Petition Vol. I, sec. III. In the Petition, Mosaic alleged that the GOR provides countervailable subsidies to Russian phosphate fertilizer producers, including through the provision of phosphate mining rights for LTAR and the provision of natural gas for LTAR. *See Countervailing Duty Investigation Initiation Checklist, Phosphate Fertilizers From the Russian Federation* at 7-9 (July 16, 2020), P.R. No. 43, C.R. No. 21.

Commerce initiated the underlying countervailing duty investigation on July 16, 2020, covering the period January 1, 2019 through December 31, 2019, and it selected Phosphorite (part of the EuroChem Group ("EuroChem")) and Joint Stock Company Apatit ("Apatit") (part of PhosAgro PJSC ("PhosAgro")) as mandatory

respondents.  Commerce issued initial questionnaires and several supplemental

questionnaires to the GOR, Phosphorite, and PhosAgro between August 2020 and

November 2020.  *See Phosphate Fertilizers From the Russian Federation:*

*Preliminary Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 76,524

(Dep't Commerce Nov. 30, 2020), P.R. No. 319 ("*Preliminary Determination*"),

and accompanying Issues and Decision Memorandum at 2, P.R. No. 308 ("PDM").

These questionnaires instructed the GOR to provide information about the natural

gas market in Russia and instructed Phosphorite and PhosAgro to provide

information about their purchases of natural gas from governmental entities.

Appx731-1020; Appx1782-1789; Appx1962-1963; Appx1962-1963.

Mosaic submitted information showing that the Russian natural gas market

is distorted by the GOR's involvement in the market through Gazprom and

Rosneft, as well as all necessary information for Commerce to construct a "tier

three" benchmark under 19 C.F.R. § 351.511(a)(2)(iii) using OECD and EU

country prices for natural gas sourced from the International Energy Agency

("IEA").  *See* Appx1034-1667.  Phosphorite submitted an expert report that it

commissioned for purposes of this investigation, the "Brattle Report."  Appx1673-

1728.  The Brattle Report purports to show that the natural gas market in Russia is

not distorted and provide information on gas production costs in Russia.  *See id.*

### 2.    Preliminary Determination

Commerce published its preliminary determination on November 30, 2020.

Commerce calculated preliminary ad valorem subsidy rates of 72.50 percent for

Phosphorite and 20.94 percent for Apatit. *Preliminary Determination*, 85 Fed.

Reg. at 76,525. Commerce preliminarily found that the Natural Gas for LTAR

program is countervailable. *See* PDM at 18. In particular, Commerce found that

the GOR confers a financial contribution on Phosphorite, Apatit, and their cross-

owned affiliates in the form of the provision of a good for LTAR through sales of

natural gas by Gazprom and Rosneft; that the respondents received benefits under

this program during the POI; and that the provision of natural gas for LTAR

program is *de facto* specific. *See id.* at 8-18.

With regard to specificity, Commerce explained in the PDM that it

instructed the GOR in the initial questionnaire to provide purchase data (volumes

and values) for natural gas by industrial classification during the POI, but the GOR

reported that it did not maintain data on the industries in Russia that purchase

natural gas. *Id.* at 12. In its first supplemental questionnaire response, the GOR

reported that "according to the information provided by the Russian fertilizer

industry, the Russian fertilizer industry in 2019 consumed only 4.7% of Russia's

total gas consumption." Appx1024.

Commerce asked the GOR in its second supplemental questionnaire to provide a detailed breakdown, by industry sector, of the volume and value of consumption of natural gas in Russia during the POI.  Appx1785-1787.  In response, the GOR reported again that it does not maintain statistics on natural gas consumption by industrial sector, and it referred Commerce to Gazprom's annual reports, which include information on Russian consumption of natural gas and Gazprom's sales by industry, as an alternative data source.  *Id.*  These data show that in 2019 the "agro-chemical industry," which includes fertilizers, accounted for 4.7 percent of total consumption of natural gas (including residential/household, utilities, electricity and heat generation, and industrial).  Appx1786.

Commerce also instructed the GOR to provide a detailed breakdown, by industry sector, of the volume and value of consumption of natural gas in Russia sold by Gazprom during the POI.  Appx1786.  In response, the GOR referred Commerce to information provided by Gazprom which show that the agrochemical industry was the single-largest industrial consumer of natural gas sold by Gazprom in 2019:

- According to the information provided by PJSC Gazprom, the volume of supply of gas produced by PJSC Gazprom and its affiliates, as well as gas purchased from independent producers, to consumers of the Russian Federation via the gas transmission system of PJSC Gazprom in 2019 was ███████████████.

**Table 1**
*(in mln cubic meters)*

|  |  |
|---|---|
| Electricity | ████████ |
| Oil industry | ████████ |
| PJSC "Gazprom" (for own technological needs of the companies of the Gazprom Group) | ████████ |
| Metallurgical industry | ████████ |
| Agrochemical industry | ████████ |
| Cement industry | ████ |
| Petrochemical industry | ████████ |
| Automotive, tractor and agricultural engineering | ████████ |
| Agro-industrial complex | ████████ |
| Other industries | ████████ |
| Communal Services | ████████ |
| Households | ████████ |

Appx1787.

Commerce found that the Provision of Natural Gas for LTAR program is *de facto* specific based on the information that the GOR provided in its questionnaire responses. Specifically, Commerce found that Gazprom's annual reports show that "natural gas is heavily used in the agro-chemistry sector" and that "agro-chemistry was in the top natural gas consuming groups in 2019." PDM at 12. Commerce also found that "{t}he agrochemical industrial sector accounted for the largest percentage of total domestic natural gas sales among industrial groups for 2019" and that "{n}o other specific industrial sectors are listed in the top {natural gas} consuming groups for 2019." *Id.*

Commerce also found that the agrochemical industry's share of Russian natural gas consumption was "likely understated," because Gazprom calculated the figure on the basis of data that included consumption by non-manufacturing sectors, such as households, electricity, and utilities. *Id.* Commerce compared the agrochemical industry's share of consumption to the next three largest industries and to the "other" industries category – which accounted for 37 percent of total consumption in 2019 – and concluded that "{t}his comparison indicates that the agro-chemistry industry is a predominant consumer of natural gas when compared to other industrial sectors." *Id.*

To assess the adequacy of remuneration and thereby calculate the amount of benefit conferred under this program, Commerce applied the hierarchy for selecting a benchmark under 19 C.F.R. § 351.511(a)(2). *Id.* at 13. Commerce preliminarily determined that there were no suitable "tier one" in-country prices for natural gas in Russia under 19 C.F.R. § 351.511(a)(2)(i), because the market for natural gas is distorted through the GOR's predominant role in the market, including through Gazprom's monopoly over the Russian gas pipeline network and other interventions. *Id.* at 14. Commerce preliminarily determined there were no appropriate "tier two" world market prices under 19 C.F.R. § 351.511(a)(2)(ii), because the pipelines connecting Russia to export markets are unidirectional (flowing outward from Russia) such that natural gas export prices from markets in

North America, South America, Europe, Africa, and Australia are not prices that would be "available to purchasers in Russia," within the meaning of the regulation. *Id.* at 15. Commerce therefore conducted a "tier three" analysis under 19 C.F.R. § 351.511(a)(2)(iii). *Id.* at 16-17.

As discussed above, Section 351.511(a)(2)(iii) of Commerce's regulations provides that, under a tier three analysis of the adequacy of remuneration, Commerce is to examine whether the government price is "consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii). Commerce found that "the most appropriate proxy for a market-based natural gas benchmark to apply under tier three is a regional European OECD natural gas price," based on "export prices sourced from the International Energy Agency (IEA), which the petitioner placed on the record." *Id.* at 17. This is the same benchmark methodology for Russian natural gas that Commerce had previously used in *Steel Concrete Reinforcing Bar from the Republic of Turkey*. *See* PDM at 17-18; *see also Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) ("*Turkey Rebar II*"), and accompanying Issues and Decision Memorandum ("Turkey Rebar II IDM"), Comment 1.

To calculate the benefit conferred by the GOR's provision of natural gas for LTAR, Commerce compared the monthly IEA benchmark unit prices to the unit

prices that the respondents paid to Gazprom and Rosneft, including delivery charges, surcharges, and taxes during the POI and, for instances where the benchmark price was greater, multiplied the difference by the quantity of gas purchased. PDM at 18. Summing the benefit for each respondent and dividing this amount by the applicable sales denominators yielded subsidy rates of 68.89 percent ad valorem for Phosphorite and 19.35 percent ad valorem for Apatit. *Id.*

### 3. Final Determination

Commerce published the *Final Determination* in the Federal Register on February 16, 2021. *See Final Determination* at 9,479. Commerce continued to find that Gazprom and Rosneft are governmental authorities under 19 U.S.C. § 1677(5)(B)(i), such that the natural gas sold by Gazprom and Rosneft to the respondents constitutes a financial contribution under 19 U.S.C. § 1677(5)(D)(iii). Appx1840-1842; Appx1845-1847.

Commerce also affirmed its preliminary finding that the provision of natural gas for LTAR program is *de facto* specific because the agrochemical sector (which includes fertilizers) was the single-largest industrial consumer of natural gas sold by Gazprom during the POI and among the top five consuming industries, and therefore was a "predominant user" of the subsidy. IDM at 44-45. Specifically, Commerce found that Gazprom's 2019 annual report shows that "natural gas is heavily used by the agro-chemistry sector and agro-chemistry was in the top five

natural gas consuming groups for 2019," and that "{n}o other specific industrial sectors are listed in the top five consuming groups for 2019." *Id.* at 44. Commerce also found, based on the GOR's reporting in its second supplemental questionnaire response, that "{t}he agrochemical industrial sector accounted for the largest percentage of Gazprom's total domestic natural gas sales among industrial groups for 2019." *Id.*

Commerce explained that its *de facto* specificity analysis reasonably excluded natural gas consumption by non-manufacturing sectors (*i.e.*, households, housing/utilities, power generation/heating) based on the text of section 771(5A)(D)(iii)(I) of the Act. IDM at 44. Specifically, this provision states that Commerce may find a subsidy program *de facto* specific if the actual recipients of the subsidy, whether on an "enterprise or industry" basis, are limited in number. 19 U.S.C. § 1677(5A). Further, Commerce noted that section 771(5A) of the Act states that "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries." IDM at 43. Commerce then reaffirmed its preliminary finding that a comparison of the agrochemical industry's share of natural gas consumption with the next three largest industries' (as well as the "other" category) shares "indicates that the Agro-chemical industry is a predominant consumer of natural gas when compared to other industrial sectors." *Id.* at 44.

Finally, Commerce reaffirmed its preliminary selection of a tier three benchmark based on the IEA data. Commerce rejected respondents' arguments that the IEA data do not account for "prevailing market conditions" in Russia and that Commerce should have used Russian gas prices presented in the Brattle Report instead. IDM at 53-54.

### 4. CIT Proceeding in *Mosaic I*

On appeal to the CIT, EuroChem challenged Commerce's *de facto* specificity determination and selection of the IEA data as a tier three benchmark for the natural gas for LTAR program, among other issues. *See* Appx12-13. The CIT sustained Commerce's *de facto* specificity and benefit determinations for the natural gas for LTAR program as supported by substantial evidence and otherwise in accordance with law.

With respect to Commerce's specificity determination, the CIT held that "Commerce has discretion to determine what predominant means in the context of § 1677(5A)(D)(iii), and it reasonably chose to exclude certain users in order to evaluate predominate industrial use." Appx15. The CIT also held that "substantial evidence supports Commerce's determination that the provision of natural gas was *de facto* specific" because "{w}hen comparing only industrial users' purchases, the record reflects that the agrochemical industry purchased a far greater amount than any other industrial user, perhaps because of the specific uses here of natural gas,

- 15 -

not just for power, but in the production of ammonia (a component in the production of phosphate fertilizer) and fertilizer." *Id.* The CIT also distinguished the only case that EuroChem cited in its opening brief, *Bethlehem Steel*, because it involved a different kind of subsidy program (one that encouraged off-hours electricity usage) and increased consumption was part of the inherent nature of the program. *Id.*

With regard to Commerce's benefit determination, the CIT held that "Commerce reasonably determined the Brattle Report was unreliable and the Russian market was distorted." Appx24. The CIT also held that Commerce has discretion in choosing between the alternative benchmarks on the record, and that "the IEA data was a reasonable benchmark selection because the data stated it was for industry users and would be comparable to natural gas for industrial use in Russia." *Id.*

The CIT remanded to Commerce on other issues. Appx28-34. Commerce filed its final redetermination in the first remand proceeding on December 16, 2022. Appx1978-2010. The CIT issued an opinion on July 11, 2023, affirming certain aspects of Commerce's first remand results and remanded a second time. Appx43-65. Commerce filed its final results in the second remand on October 11, 2023. Appx2011-2041. On January 19, 2024, the CIT issued Slip Op. 24-4, sustaining Commerce's second remand redetermination. Appx66-72. On the same

day, the Court entered judgment in favor of the United States. Appx73-74. This appeal followed.

## SUMMARY OF THE ARGUMENT

Commerce's *de facto* specificity analysis for the natural gas for LTAR subsidy program is supported by substantial evidence and otherwise in accordance with law. Commerce properly found that the agrochemical industry is a "predominant user" of the subsidy based on the record evidence submitted by the GOR regarding consumption and Gazprom's sales of gas by sector. Commerce's decision to focus on consumption by industries, setting aside consumption by non-industrial groups, was based on a reasonable interpretation of the statute. EuroChem asserts that Commerce did not identify the statutory text supporting its decision to evaluate usage only among industrial users, but this is plainly incorrect. Further, EuroChem failed to raise the argument that Commerce's *de facto* specificity analysis is untethered from the statutory text and entitled to no deference before Commerce or the CIT, thus failing to exhaust its administrative remedies and waiving this argument.

Commerce's benefit analysis for the natural gas for LTAR program is also supported by substantial evidence and otherwise in accordance with law. As an initial matter, EuroChem failed to exhaust its administrative remedies regarding its argument that Commerce was obligated under tier three to evaluate Gazprom's

price setting methodology and cost recovery.  Further, Commerce is not required

by law to undertake the analysis EuroChem advocates.  Nonetheless, Commerce

provided a reasonable explanation for why it could not test whether Gazprom's

prices are market-based using private Russian gas producers' prices, and it was

reasonable for Commerce to refer to its prior findings on market distortion in its

tier three analysis.  Finally, Commerce was not obligated by to law to make any

adjustments to the tier three benchmark data to account for purported "prevailing

market conditions" in Russia.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews decisions of the CIT *de novo*, applying "the statutory

standard of review that the {CIT} applied in reviewing the administrative record."

*Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir.

2014) (citation omitted).  Thus, this Court will hold unlawful any determination,

finding, or conclusion found "to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law{.}"  19 U.S.C.

§ 1516a(b)(1)(B)(i).

Substantial evidence is such "evidence that a 'reasonable mind might accept

as adequate to support a conclusion,'" *Downhole Pipe & Equip., LP v. United*

*States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (quoting *Consolidated Edison Co. of*

*N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)).

"The Court's function is not to re-weigh the evidence," *USEC Inc. v. United States*, 259 F. Supp. 2d 1310, 1317 (CIT 2003), and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted). Absent some showing to the contrary, Commerce is entitled to the presumption that it considered the record evidence as a whole. *Nat'l Ass'n of Mirror Mfrs. v. United States*, 696 F. Supp. 642, 648 (CIT 1988); *see also Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001).

Under 28 U.S.C. § 2637(d), the Court "shall, where appropriate, require the exhaustion of administrative remedies" in actions arising from Commerce's countervailing duty determinations. *See Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014) (quoting 28 U.S.C. § 2637(d)). This Court has taken "a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007); *accord Clearon Corp. v. United States*, 800

F. Supp. 2d 1355, 1362 (CIT 2011); *Fuwei Films (Shangdong) Co. v. United States*, 791 F. Supp. 2d 1381, 1384 (CIT 2011).  This Court has also explained that a party's obligation to exhaust its administrative remedies before Commerce applies both to overall issues and to individual arguments.  *See Rhone Poulenc, Inc. v. United States*, 710 F. Supp. 341, 348 (CIT 1989), *aff'd*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  Further, apart from certain exceptional circumstances, arguments raised for the first time on appeal are waived.  *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 110 n.3 (Fed. Cir. 2022) (citing *Hylete LLC v. Hybrid Athletics, LLC*, 931 F.3d 1170, 1175 (Fed. Cir. 2019)).

## II.  COMMERCE'S *DE FACTO* SPECIFICITY DETERMINATION FOR THE NATURAL GAS FOR LTAR PROGRAM WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

The Court should affirm the CIT's judgment sustaining Commerce's determination that the Provision of Natural Gas for LTAR program is *de facto* specific.  Further, EuroChem failed to raise its arguments related to the meaning of "predominant user," and the lawfulness of Commerce's limiting the analysis to industrial users, before Commerce or the CIT.  Accordingly, EuroChem has waived these arguments.  Furthermore, EuroChem's arguments challenging Commerce's decision are not supported by the statute or the record evidence.

## A. EuroChem Waived Its Arguments Regarding The Interpretation Of "Predominant User" In § 1677(5A)(D)(iii)

EuroChem argues that Commerce's approach to conducting its *de facto* specificity analysis was not reasonable. EuroChem Br. 10. EuroChem cites the text of the Act, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), dictionary definitions, and the preamble to Commerce's regulation in support of its argument regarding how to interpret the statute. EuroChem failed to exhaust its administrative remedies concerning this argument and also failed to present this argument in its briefs to the CIT.

Pursuant to 28 U.S.C. § 2637(d), a party must exhaust its administrative remedies prior to bringing an action in this Court, except in limited circumstances not relevant to this case. *See, e.g.*, *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912-913 (Fed. Cir. 2017). "Commerce regulations require the presentation of all issues and arguments in a party's case brief," and this Court "ha{s} held that a party's failure to raise an argument before Commerce constitutes a failure to exhaust its administrative remedies." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1388 (Fed. Cir. 2014). EuroChem did not make its statutory interpretation argument in its case brief or rebuttal brief before Commerce. *See* EuroChem Case Br.; EuroChem Rebuttal Br. Thus, Commerce has had no opportunity to address this argument because it was not raised in the underlying administrative proceeding.

Further, EuroChem also failed to make its statutory interpretation argument in its opening brief before the CIT. *See* EuroChem Br. 11-12. Because EuroChem failed to exhaust its administrative remedies and present this argument before the trial court, it has waived its argument related to the statutory interpretation of "predominant user" in section 1677(5A)(D)(iii) of the Act.

## B. Commerce's Interpretation Of § 1677(5A)(D)(iii) Is Reasonable

EuroChem argues that Commerce's specificity analysis "was untethered from the statutory text and thus contrary to law and entitled to no deference." EuroChem Br. 10. To the contrary, Commerce's analysis was firmly grounded in the statutory text, and its determination that the GOR's provision of natural gas was *de facto* specific was reasonable and supported by substantial evidence.

Section 771(5A)(D) of the Act sets forth the law that Commerce is required to follow in determining whether a domestic subsidy "is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy … " 19 U.S.C. § 1677(5A)(D). Under section 771(5A)(D)(i), a subsidy is *de jure* specific if the authority providing the subsidy "expressly limits access to the subsidy to an enterprise or industry{.}" *Id.* § 1677(5A)(D)(i). Under section 771(5A)(D)(iii), a subsidy is *de facto* specific if "(1) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (2) An enterprise or industry is a

predominant user of the subsidy; (3) An enterprise or industry receives a disproportionately large amount of the subsidy; or (4) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others." *Id.* § 1677(5A)(D)(iii)(I)-(IV). Finally, "any reference to an enterprise or industry … includes a group of such enterprises or industries." *Id.* § 1677(5A).

Thus, as the foregoing text makes clear, for both *de jure* and *de facto* subsidies, the statute directs Commerce to assess specificity by focusing on the receipt and use of the subsidy by an enterprise or industry (or group of enterprises or industries). *See id*.

Commerce acknowledged the statutory text in the *Final Determination*, noting correctly that "{u}nder section 771(5A)(D)(iii)(I) of the Act, we may find a subsidy program *de facto* specific if the actual recipients of the subsidy, whether on an enterprise or industry basis, are limited in number." IDM at 44. Commerce also correctly noted that "section 771(5A) of the Act states that 'any reference to an enterprise or industry is a reference to a foreign enterprise or industry and includes a group of such enterprises or industries.'" *Id.* Commerce reasonably interpreted the repeated references to "enterprise" or "industry" in section 771(5A)(D)(iii) to mean that it should focus its *de facto* specificity analysis on natural gas consumption by "industries," or industrial sectors, and therefore

exclude non-manufacturing sectors (*i.e.*, households, electricity, utilities, and power generation/heating) from its assessment. *Id.*

Moreover, because the text does not expressly define what constitutes "predominant" use of a subsidy, Commerce has discretion to determine what the term means in the context of section 771(5A)(D)(iii). Appx13-15; *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (CIT 2001) ("Because neither 'dominant' nor 'disproportionate' are defined in the relevant statute, {the court} is obligated to defer to Commerce's reasonable interpretation thereof."). Here, Commerce's interpretation is reasonable because it is consistent with the ordinary meaning of the text, as well as the broader context of 771(5A), which repeatedly references an "industry" or "industries" as being the focus of Commerce's analysis.

EuroChem argues that "{n}othing in the statute directs, let alone permits, Commerce to evaluate subsidy usage by an enterprise or industry among only a subset of users (*e.g.*, industrial users) within the overall economy in the subject country" and that "{t}he statute instead directs Commerce to evaluate whether an enterprise or industry is the predominant user of the subsidy within the jurisdiction of the government authority. Here, that required Commerce to evaluate whether the Russian fertilizer industry was the predominant user of natural gas as compared to all natural gas consumers within Russia." EuroChem Br. 10. As an initial

matter, EuroChem is misquoting the statute. Section 771(5A)(D)(iii)(II) directs Commerce to consider whether "an industry is *a* predominant user of the subsidy," not "*the* predominant user." 19 U.S.C. § 1677(5A)(D)(iii)(II) (emphasis added). This is exactly what Commerce did.

Further, the statute does not state that Commerce's analysis must take into account "the overall economy in the subject country." Indeed, that language does not appear anywhere in section 771(5A)(D). Rather, the text of section 771(5A)(D)(iii) directs Commerce to consider the "enterprises" or "industries" (or groups of enterprises or industries) that received the subsidy, as discussed above. And while the SAA does reference situations where the benefit of a subsidy may be spread "throughout an economy{,}" SAA at 260, it does not follow that Commerce must include household consumers and other non-industrial entities in its *de facto* specificity analysis as EuroChem argues.[1]

_____

[1]     EuroChem claims that Commerce recognized in its implementing regulations" that "where a subsidy is broadly available and widely used throughout an economy it cannot be found *de facto* specific." EuroChem Br. 12 (citing *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,357 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*")). In actuality, however, Commerce's implementing regulations say no such thing, *see* 19 C.F.R. § 351.502, and EuroChem has taken the preambular language that it is paraphrasing out of context. *See CVD Preamble*, 63 Fed. Reg. at 65,357 ("Section 771(5A)(D) of the Act provides that a subsidy may be found to be specific if it is limited to a 'group' of enterprises or industries. There is no requirement that the members of a group share similar characteristics. The purpose of the specificity test is simply to ensure that subsidies that are distributed very widely throughout an economy are not countervailed. There is no

The reasonableness of Commerce's decision to limit its *de facto* subsidy analysis to industrial users in this case is further demonstrated by the fact that the GOR itself differentiates between industrial and other consumers in setting regulated prices for natural gas. Specifically, in response to Commerce's request to provide "the regulated prices for natural gas in Russia on a monthly basis during the POI," the GOR provided regulated wholesale prices for natural gas *to industrial consumers*. *See* Appx1966-1975.[2] The subsidy at issue is directed to industrial consumers of natural gas, and it was reasonable for Commerce to analyze *de facto* specificity on that basis.

This Court should therefore affirm the CIT's holding that Commerce's interpretation of the statute was reasonable and within the agency's discretion.

## C. Substantial Evidence Supports Commerce's Finding That The Agrochemical Industry Is A "Predominant User" Of The Subsidy

EuroChem also challenges Commerce's finding that the agrochemical industry is a "predominant user" of the Natural Gas for LTAR subsidy program as unsupported by the record evidence. EuroChem cites the fact that the

---

basis for adding the further requirement that subsidies that are not widely distributed are also confined to a group of enterprises or industries that share similar characteristics.").

[2]  Gazprom's annual reports also state that "{i}n accordance with Russian laws, end consumers buy gas at regulated prices which are differentiated by consumer group (household vs. industrial consumers)." *See* Appx1976.

agrochemical industry consumed 4.7 percent of Russia's total natural gas consumption in 2019 and asserts that "{i}n no reasonable interpretation can 4.7 percent usage be found to be 'predominant.'" EuroChem Br. 12. EuroChem's argument fails for several reasons.

*First*, substantial evidence supported Commerce's conclusion that the agrochemical industry is a predominant user of the natural gas for LTAR subsidy. This evidence includes: (1) the agrochemical industry was in the top five natural gas consuming groups in 2019 (including both industrial and non-industrial consumers); (2) no other specific industrial sector was listed in the top five consuming groups in 2019; (3) the agrochemical industry accounted for the largest percentage of Gazprom's total domestic natural gas sales among industrial groups in 2019; and (4) a comparison of the agrochemical industry with the next three largest industries' consumption of natural gas (each accounting for a small percentage of consumption, less than half that of the agrochemical industry), as well as the "other" industrial category (which includes gas consumers from all industries and sectors, and the proportion of consumption for each group is insignificant).[3] IDM at 44.

---

[3]    These data are proprietary, and for that reason Commerce did not discuss the specific percentages in its decision memorandum. *See* IDM at 44.

*Second*, as explained in Section II.B., Commerce lawfully limited its *de facto* specificity analysis to industrial users of natural gas. Therefore, the fact that the agrochemical industry accounted for 4.7 percent of total consumption – meaning consumption of both industrial and non-industrial users – does not detract from Commerce's analysis.

Thus, the Court should reject EuroChem's argument that Commerce's *de facto* specificity analysis is unsupported by substantial evidence.

## III. COMMERCE'S BENEFIT DETERMINATION FOR THE NATURAL GAS FOR LTAR PROGRAM WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

### A. EuroChem Waived Its Arguments Regarding Commerce's Purported Obligation To Evaluate Whether Gazprom's Prices For Natural Gas Reflect Market Principles

EuroChem argues that Commerce's tier three benchmark analysis for natural gas was unlawful because "Commerce should first have evaluated whether Gazprom's prices were consistent with market principles before considering use of an external benchmark." EuroChem Br. 14. EuroChem failed to exhaust its administrative remedies concerning this argument.

As explained above, pursuant to 28 U.S.C. § 2637(d), a party must exhaust its administrative remedies prior to bringing an action in this Court, except in limited circumstances not relevant to this case. *See, e.g.*, *Boomerang Tube*, 856 F.3d at 912-913. "Commerce regulations require the presentation of all issues and

arguments in a party's case brief," and this Court "ha{s} held that a party's failure to raise an argument before Commerce constitutes a failure to exhaust its administrative remedies." *Qingdao Sea-Line Trading Co.*, 766 F.3d at 1388. EuroChem did not present the argument that Commerce should evaluate if Gazprom's prices are set in accordance with market principles in its case brief or rebuttal brief to Commerce. *See* EuroChem Case Br.; EuroChem Rebuttal Br. EuroChem cites page 7 of its rebuttal brief, *see* EuroChem Br. 18, but its argument to this Court regarding Commerce's obligation to evaluate whether Gazprom's prices are set in accordance with market principles appears nowhere on that page.

Because EuroChem failed to exhaust its administrative remedies, it has waived its argument regarding Commerce's purported obligation to evaluate Gazprom's prices as consistent with market principles.

**B.  Commerce's Application Of Its Tier Three Benchmark Regulation, § 351.511(a)(2)(iii), Was Reasonable, Supported By Substantial Evidence, And Otherwise In Accordance With Law**

EuroChem argues that Commerce's application of its tier three benchmark regulation, 19 C.F.R. § 351.511(a)(2)(iii), was unlawful because "Commerce should first have evaluated whether Gazprom's prices were consistent with market principles before considering use of an external benchmark." EuroChem Br. 14. EuroChem cites the *CVD Preamble* and Commerce's statement that it "normally" assesses whether prices are market-based through an analysis of the government's

price-setting philosophy and cost-recovery, *id.*, and asserts that Commerce "failed to provide any explanation for departing from its normal practice under Tier 3." *Id.* at 16. EuroChem is incorrect. Commerce is not required by law to undertake the analysis EuroChem advocates. Further, Commerce provided a reasonable explanation for why it could not test whether Gazprom's prices are market-based through an analysis of its price-setting philosophy and cost-recovery.

Commerce's regulation provides that under tier three, it "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii). The regulation does not specify how the agency is to perform this assessment, however. And while the *CVD Preamble* states that "in situations where the government is clearly the only source available to consumers in the country," Commerce will analyze such factors as the government's price-setting philosophy, costs, or possible price discrimination, it also states that Commerce "may" rely on one or more of these factors in any particular case. *CVD Preamble*, 63 Fed. Reg. at 65,378. In other words, they are not mandatory. IDM at 53.

Nonetheless, contrary to EuroChem's arguments, Commerce did evaluate whether Gazprom's prices are consistent with market principles, and it included a lengthy discussion of the issue in the *Preliminary Determination*, including with respect to Gazprom's price-setting philosophy. PDM at 16-17. Commerce

explained that, in *Cold-Rolled Steel From the Russian Federation*, it had found that Gazprom's prices are not set in a manner consistent with market principles because Gazprom's annual reports described "fundamental flaws" that prevent competition in the market, and that Gazprom sells the bulk of its gas at regulated prices that are "set at below the sustainable level to bolster the national economy." *Id.* at 16. Commerce also explained that the record of this investigation demonstrates the "systemic fundamentals of Gazprom's price setting have not changed." *Id.* Commerce noted that Gazprom still sells the bulk of its gas at regulated prices set based on the government's social and economic development goals rather than market principles, as evidenced by statements in its 2019 annual reports. *Id.* at 16-17.

In the *Final Determination*, Commerce addressed PhosAgro's arguments[4] that it could test whether Gazprom's sales at regulated prices allow for cost-recovery, investment, and profit by looking to the prices and performance of private Russian gas companies such as Novatek. IDM at 54. Commerce concluded that such an analysis was not possible because – as it had previously

---

[4] The other Russian respondent, PhosAgro, argued in its case brief before Commerce that the agency should have assessed Gazprom's price-setting using data presented in the Brattle Report regarding private gas suppliers' pricing, costs, and profitability. PhosAgro Case Br. 16-18. EuroChem did not present this argument in its case or rebuttal brief before Commerce.

found in its tier one analysis – the entire Russian natural gas market is distorted by significant government interventions, such that Novatek's prices are not market-based and therefore are not informative of whether Gazprom's prices are market-based. *Id.* Commerce's conclusion is reasonable and supported by substantial evidence.

EuroChem argues that Commerce's "excuse" for allegedly not conducting its normal tier three analysis "does not withstand scrutiny" because "{g}overnment-created distortion is a consideration only of whether Commerce can rely on in-country transaction prices from non-government entities as a Tier 1 benchmark." EuroChem Br. 16. This argument is nonsensical and has no basis in Commerce's regulations. As explained above, Commerce's tier three regulation, § 351.511(a)(2)(iii), does not prescribe how the agency is to analyze whether prices are consistent with market principles. Thus, it is within the agency's discretion to consider government-created distortion of market prices.

Commerce explained in detail in its tier one analysis how the GOR's significant interventions in the market distort all Russian gas prices, including Novatek's. *See* IDM at 49-50; *see also* PDM at 14-15. Commerce reasonably referred to its prior findings on market distortion in rejecting PhosAgro's argument that the tier three analysis should test Gazprom's price-setting and cost-recovery by reference to Novatek's prices. IDM at 54. EuroChem's argument also ignores that

Commerce was following its prior approach in *Cold-Rolled Steel From the Russian Federation*. *See* PDM at 15-16. Thus, Commerce did not fail to provide a reasoned explanation for its decision or unlawfully depart from prior practice.

### C. Commerce Was Not Obligated To Adjust The IEA Data To Account For Market Conditions In Russia

EuroChem argues that "Commerce failed to comply with the statutory requirement that the adequacy of remuneration 'be determined in relation to prevailing market conditions for the good … being provided … in the country which is subject to the investigation or review.'" EuroChem Br. 17 (citing 19 U.S.C. § 1677(5)(E)(iv)). EuroChem is incorrect that the "prevailing market conditions" language in section 771(5)(E)(iv) of the Act requires Commerce to reject the IEA data or make adjustments to reflect purported differences between the European and Russian markets for natural gas.

Section 771(5)(E)(iv) of the Act provides that the Department is to measure the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided … in the country which is subject to … review." 19 U.S.C. § 1677(5)(E)(iv). Section 771(5)(E)(iv) explains that "{p}revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *See id.* However, the courts have previously found that Congress' intent in adopting this language is unclear, and therefore that the Department has broad discretion in interpreting how best to

account for relevant prevailing market conditions. *See POSCO v. United States*, 353 F. Supp. 3d 1357, 1372 (CIT 2018); *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1306 (CIT 2017). Thus, the Department has substantial discretion to determine what, if any, adjustments would be necessary to account for relevant prevailing market conditions in Russia.

EuroChem argues that "{t}he statute required Commerce to account for the fact that the European OECD prices used by Commerce are driven by different supply and demand conditions than those that exist in Russia," EuroChem Br. 18, and faults Commerce for "cavalierly disregard{ing} the bedrock undisputed economic principle of comparative advantage." *Id.* at 20. The statute does not require Commerce to adjust benchmark prices to account for "comparative advantage" or "different supply and demand conditions." As the CIT observed in *RZBC Group Shareholding Co. v. United States*, the statute lists the conditions that Commerce should consider as "prevailing market conditions" (including price, quality, availability, marketability, and transportation), 100 F. Supp. 3d 1288, 1306 (CIT 2015), and the list does not include either "comparative advantage" or "different supply and demand conditions." *See* 19 U.S.C. § 1677(5)(E)(iv).

Notably, EuroChem cites no legal authority or case law in support of its argument, as none exists. Indeed, the CIT has sustained Commerce's reliance on IEA data in constructing a tier three benchmark for natural gas in Turkey. *Içdaş*

*Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1370-1371 (CIT 2021) (citing *Rebar Trade Action Coal. v. United States I*, 389 F. Supp. 3d 1371 (CIT 2019)); *Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.Ş. v. United States*, 459 F. Supp. 3d 1341 (CIT 2020)).  Nothing in the statute requires that a benchmark precisely match, or be adjusted to match, all conditions in the subsidizing country.  *See Lumber IV*, IDM at Comment 3.  Rather, a potential benchmark must merely "bear a reasonably realistic resemblance to the importing market's reality."  *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1341 (CIT 2015).  EuroChem fails to demonstrate that the IEA data does not meet this standard.

This Court should therefore reject EuroChem's arguments that Commerce's selection of the IEA data as a tier three benchmark was unsupported by substantial evidence or otherwise not in accordance with law.

## CONCLUSION

For the reasons discussed above, Mosaic respectfully requests that this Court reject all arguments made by EuroChem and affirm the CIT's judgment in favor of the United States.

Respectfully submitted,

/s/ David J. Ross
DAVID J. ROSS
STEPHANIE E. HARTMANN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

*Attorneys for Plaintiff-Appellee*
*The Mosaic Company*

July 17, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 17th day of July, 2024, I filed the Non-Confidential Brief for Plaintiff-Appellee The Mosaic Company with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ David J. Ross

DAVID J. ROSS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing document contains 17 number of unique words (including numbers) marked confidential.

| | |
|---|---|
| ☐ | This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A). |
| X | This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b). |
| ☐ | This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements. |

/s/ David J. Ross
DAVID J. ROSS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

July 17, 2024

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.     The filing has been prepared using a proportionally-spaced typeface and includes 7,483 words.

2.     The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ David J. Ross
DAVID J. ROSS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

July 17, 2024