# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## THE MOSAIC COMPANY,

### Plaintiff-Appellee,

### v.

## UNITED STATES,

### Defendant-Appellee,

### v.

## PHOSAGRO PJSC, JSC APATIT, INDUSTRIAL GROUP PHOSPHORITE, LLC,

### Defendants-Appellants.

Appeal from the United States Court of International Trade in Case Nos. 1:21-cv-00117-JAR, 1:21-cv-00220-JAR, 1:21-cv-00221-JAR, Senior Judge Jane A. Restani

## <u>BRIEF OF DEFENDANT-APPELLEE THE UNITED STATES</u>

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
JARED M. CYNAMON
Attorney
Office of the Chief Counsel
for Trade Enforcement
& Compliance
U.S. Department of Commerce
Washington, DC 20230

July 17, 2022

ELIZABETH ANNE SPECK
Senior Trial Counsel
Department of Justice, Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0369
Email: elizabeth.speck@usdoj.gov

Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUES ................................................... 1

STATEMENT OF THE CASE ................................................... 2

STATEMENT OF FACTS ............................................... 3

    I.     Relevant Statutory And Regulatory Provisions ........................ 3

    II.    Countervailing Duty Investigation ............................................ 6

    III.    Proceedings Before The Trial Court ........................................ 10

SUMMARY OF THE ARGUMENT ........................................... 11

ARGUMENT ...................................................................... 13

    I.     Standard Of Review ................................................ 13

    II.    Commerce Reasonably Concluded That The Provision Of Natural Gas For Less Than Adequate Remuneration Was *De Facto* Specific ...................................................... 14

        A.    Record Evidence Shows That The Agrochemical Industry Is A Predominant User Of Natural Gas ............ 14

        B.    EuroChem's Arguments Ignore The Relevant Statutory Language ........................................................ 17

    III.    Commerce's Conclusion That Gazprom's Prices Were Not Set In Accordance With Market Principles Is Supported By Substantial Evidence And Is In Accordance With Law ........... 20

        A.    Commerce May Consider Distortions In The Market When Analyzing Whether Prices Are Set In Accordance With Market ............................................. 21

B.     Substantial Evidence Supports Commerce's Conclusion That Russian Prices Were Not Set In Accordance With Market Principles ............................ 23

C.     EuroChem's Mere Disagreement With Commerce's Analysis Does Not Establish Reversible Error………...26

IV.    Commerce's Use Of A Constructive Benchmark Price Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law ............................................................... 28

A.     Commerce Reasonably Selected European International Energy Agency Data In Calculating The Tier 3 Benchmark ....................................................... 28

B.     Commerce Was Not Required To Make Additional Adjustments To The International Agency Data .......... 30

CONCLUSION ............................................................................... 32

# TABLE OF AUTHORITIES

CASES                                                              PAGE(S)

*AK Steel Corp. v. United States,*
    192 F.3d 1367 (Fed. Cir. 1999) ........................................ 18

*ArcelorMittal USA LLC v. United States,*
    399 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ..................................... 19

*Arunachalum v. IBM Corp.,*
    989 F.3d 988 (Fed. Cir 2021)……………………………………..30

*Canadian Solar Inc. v. United States,*
    537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) .................................... 28

*Changzhou Trina Solar Energy Co., v. United States,*
    352 F. Supp. 3d 1316 (Ct. Int'l Trade 2019) .................................... 29

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938).......................................................... 27

*Dupont Teijin Films USA, LP, v. United States*,
    407 F.3d 1211 (Fed. Cir. 2005) ........................................ 13

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S., et al. v. United States*,
    459 F. Supp. 3d 1341(Ct. Int'l Trade 2021)...................................... 28

*Heze Huayi Chem. Co. v. United States,*
    532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) .................................... 29

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021)..................................... 29

*Matsushita Elec. Indus. Co., LTD v. United States*,
    750 F. 2d 927 (Fed. Cir. 1984) ........................................ 28

*Monsanto Co. v. Scruggs,*
    459 F.3d 1358 (Fed. Cir. 2006) ........................................ 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. at 29 (1983) ........................................................................ 31

*Norsk Hydro Canada, Inc. v. United States*,
  472 F.3d 1347 (Fed. Cir. 2006) .......................................................... 3

*Nucor v. United States,*
  927 F.3d 1243 (Fed. Cir. 2019) ................................................... 19, 22

*QVD Food Co. v. United States*,
  658 F.3d 1318 (Fed. Cir. 2011) ........................................................ 31

*Rebar Trade Action Coal. v. United States*,
  398 F. Supp. 3d 1371 (Ct. Int'l Trade 2019) ..................................... 30

*SmithKline Beecham Corp., v. Apotex Corp.,*
  439 F.3d 1312 (Fed. Cir. 2006) ................................................... 26, 27

*SNR Roulements v. United States,*
  402 F.3d 1358 (Fed. Cir. 2005) ........................................................ 13

*Timken Co., v. United States,*
  788 F. Supp. 1216 (Ct. Int'l Trade 1992) .......................................... 29

*Zhejiang DunAn Hetian Metal Co. v. United States,*
  652 F.3d 1333 (Fed. Cir. 2011) ........................................................ 28

FEDERAL STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................. 13

19 U.S.C. § 1671 .................................................................................. 3

19 U.S.C. § 1671(a) .............................................................................. 3

19 U.S.C. § 1677 .................................................................................. 3

19 U.S.C. § 1677(5A)(D)(iii)(II) ..................................................... 10, 11, 18

## FEDERAL REGULATIONS

19 C.F.R. § 351.502(a) ........................................................................ 4, 14

19 C.F.R. § 351.511 ................................................................................. 5

19 C.F.R. § 351.511(a)(2) ........................................................................ 7

19 C.F.R. § 351.511(a)(2) (i)-(ii) ......................................................... 21, 22

## ADMINISTRATIVE DETERMINATIONS

*Cold-Rolled Steel Flat Products from the Russian Federation*,
    81 Fed. Reg. 49,935
    (Dep't of Commerce July 29, 2016) ................................... 8, 16, 24, 25

*Countervailing Duties: Final Rule*,
    63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) ................ 17

*Phosphate Fertilizers From the Kingdom of Morocco and the Russian
    Federation*,
    86 Fed. Reg. 18,037 (Dep't of Commerce Apr. 7, 2021) ................... 9

*Phosphate Fertilizers from the Russian*,
    86 Fed. Reg. 9,479 (Dep't of Commerce Feb. 16, 2021) ..................... 2

*Phosphate Fertilizers from the Russian Federation,*
    85 Fed. Reg. 76,524 (Dep't of Commerce Nov. 30, 2020) .................. 6

*Steel Concrete Reinforcing Bar from the Republic of Turkey,*
    85 Fed. Reg, 16,056 (Dep't of Commerce Mar. 20, 2020) ................... 29

## OTHER AUTHORITIES

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Doc. No. 103-316, vol. 1 (1994) ......................................... 17, 20

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## THE MOSAIC COMPANY,

Plaintiff-Appellee,

v.

## UNITED STATES,

Defendant-Appellee,

v.

## PHOSAGRO PJSC, JSC APATIT, INDUSTRIAL GROUP PHOSPHORITE, LLC,

Defendants-Appellants.

**Appeal from the United States Court of International Trade in Case Nos. 1:21-cv-00117-JAR, 1:21-cv-00220-JAR, 1:21-cv-00221-JAR, Senior Judge Jane A. Restani**

## <u>BRIEF OF DEFENDANT-APPELLEE THE UNITED STATES</u>

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the Department of Commerce's (Commerce) conclusion that Public Joint Stock Company Gazprom's (Gazprom) provision of natural gas to Russian producers of phosphate fertilizers was a *de facto* specific subsidy for purposes of the countervailing duty statute because the agrochemical industry used

significantly more natural gas than any other industrial user is supported by substantial gas and otherwise in accordance with law.

     2.     Whether Commerce's conclusion that Gazprom's prices for natural gas were not set in accordance with market based principles is supported by substantial evidence and otherwise in accordance with law where record evidence demonstrated that Gazprom's pricing was directed at furthering the Russian government's social and economic development goals.

     3.     Whether Commerce reasonably selected the Organization of Economic Cooperation and Development (OECD) export prices that were sourced from the International Energy Agency (IEA) as a proxy for market based prices when the only other data set on record contained numerous flaws.

## STATEMENT OF THE CASE

This appeal concerns Industrial Group Phosphorite LLC's (EuroChem) challenge to certain aspects of Commerce's final affirmative countervailing duty determination in *Phosphate Fertilizers from the Russian*, 86 Fed. Reg. 9,479 (Dep't of Commerce Feb. 16, 2021) (final affirmative CVD determ.), and the accompanying Issues and Decision Memorandum (IDM). The period of investigation is January 1, 2019 through December 31, 2019.

## STATEMENT OF FACTS

### I.    Relevant Statutory And Regulatory Provisions

If the production of goods abroad is subsidized by a foreign government, then the goods can be subject to a countervailing duty (CVD) when the goods are imported to the United States.  19 U.S.C. § 1671.  In general terms, the goal of these duties is "to protect American firms from unfair competition by setting off the amount certain export subsidies foreign firms selling goods to the United States receive from their governments."  *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1349 (Fed. Cir. 2006).

For a countervailing duty to be imposed, two showings must be made: (1) that a countervailable subsidy was received; and (2) that the subsidy resulted in or threatened material injury to an industry in the United States.  19 U.S.C. § 1671(a).

Commerce determines that a countervailable subsidy exists in circumstances in which an "authority" provides a "financial contribution," through, for example, providing goods or services or the direct transfer of funds, which results in a "benefit conferred" to the recipient, and that the subsidy is specific within the meaning of 19 U.S.C. § 1677(5A).  19 U.S.C. § 1677(5).  In this case, Commerce found countervailable subsidies based on the Government of Russia's provision of natural gas for less than adequate remuneration.

Domestic subsidies, such as those at issue in this appeal, can be specific as a matter of law (*de jure*) or in fact (*de facto*).  *See* 19 U.S.C. § 1677(5A)(D)(i)-(iii).  A subsidy is *de jure* specific "{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i).  Pursuant to 19 U.S.C. § 1677(5A)(D)(iii) a subsidy is *de facto* specific if any one of the following four factors exist:

(I)     The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
(II)    An enterprise or industry is a predominant user of the subsidy.
(III)   An enterprise or industry receives a disproportionately large amount of the subsidy.
(IV)    The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV).  Commerce's regulations also provide that in *de facto* specificity analyses, Commerce "will examine the factors contained in {19 U.S.C. § 1677(5A)(D)(iii)} sequentially in order of their appearance.  If a single factor warrants a finding of specificity, {Commerce} will not undertake further analysis."  19 C.F.R. § 351.502(a).

In cases in which an authority provides a "financial contribution" for purposes of 19 U.S.C. § 1677(5)(D) through the provision of goods or services, a "benefit shall normally be treated as conferred" when those goods or services "are provided for less than adequate remuneration{.}"  *Id*. at §1677(5)(E)(iv).  The

statute further states that, when goods or services are provided for "less than adequate remuneration," the adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country that is subject to the investigation or review. *Id*. at § 1677(5)(E). Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id*.

Commerce's regulations outline how Commerce will evaluate the adequacy of remuneration depending on the evidentiary record. 19 C.F.R. § 351.511. First, Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question." *Id*. at § 351.511(a)(2)(i). This constitutes the tier one (tier 1) benchmark. If market-prices are not available, then Commerce measures the adequacy of remuneration "by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." *Id*. at § 351.511(a)(2)(ii). This constitutes the tier two (tier 2) benchmark.

Finally, if a tier 2 benchmark is also unavailable, then Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." *Id*. at § 351.511(a)(2)(iii).

This constitutes a tier three (tier 3) benchmark. These benchmarks are applied in hierarchal order. If the goods or services are provided for "less than adequate remuneration," then "a benefit shall normally be treated as conferred." 19 U.S.C. § 1677(5)(E)(iv). But if the goods or services are provided for adequate remuneration, then a benefit will not be found. *Id*.

## II.    <u>Countervailing Duty Investigation</u>

On July 30, 2020, Commerce initiated a countervailing duty investigation on phosphate fertilizers from Russia. Appx709. Commerce subsequently selected Industrial Group Phosphorite LLC, which is part of EuroChem, and Joint Stock Company Apatit (JSC Apatit), which is a part of PhosAgro PJSC (PhosAgro), as the mandatory respondents. Appx714.

On November 30, 2020, Commerce published its preliminary determination. *Phosphate Fertilizers from the Russian Federation*, 85 Fed. Reg. 76,524 (Dep't of Commerce Nov. 30, 2020) (prelim. CVD determ.), Appx1808, and accompanying preliminary decision memorandum (PDM), Appx1790. In its determination, Commerce determined that the provision of natural gas by Gazprom, a natural gas company that is owned and controlled by the Russian government, for less than adequate remuneration was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(II). Appx1800-1801 (citing Appx1024, Appx1785-1787); *see also* Appx108-109. Specifically, when Commerce compared the agrochemical

6

sector with other industrial sectors and excluded nonmanufacturing sectors such as "households, electricity (utilities), and communal services," it found that the "agrochemistry industry is a predominant consumer of natural gas." Appx1800.

When evaluating the existence and amount of any benefit conferred by Gazprom to the respondents, Commerce applied the benchmark methodology set forth in 19 C.F.R. § 351.511(a)(2). Appx1801. Commerce concluded that it could not use a tier 1 benchmark, which is based upon market prices from actual transactions within Russia, because market prices were unavailable. Appx1801-1802. Specifically, that Gazprom's "predominant role as a supplier of natural gas in the market and monopoly over transportation of natural gas" were such that the market "reflect{ed} the significant distortion resulting from the government's involvement." Appx1802. Commerce also concluded that it could not use a tier 2 benchmark, which compares the government price to a world market price that is available to purchasers in Russia, because the pricing information that was on the record from other countries "d{id} not reflect prices available to Russian purchasers." Appx1803.

Thus, Commerce applied a tier 3 benchmark, which examines whether the government price is consistent with market principles. Appx1804-1805; 19 C.F.R. § 351.511(a)(2)(iii). Commerce concluded that record evidence demonstrated that Gazprom's prices "were not set in a manner that is consistent with market

principles." Appx1804. Citing its decision in *Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016) (final affirm. CVD determ.) (*Russia Cold-Rolled Steel*), and accompanying IDM at cmt. 7, Commerce noted that it had previously concluded that Gazprom's prices "are not set in a manner that is consistent with market principles" and that the "systemic fundamentals of Gazprom's price setting have not changed." Appx1804. In *Russia Cold-Rolled Steel*, Commerce identified statements from the Gazprom annual reports demonstrating that Gazprom sold natural gas at "regulated prices, which were set at below the sustainable level to bolster the national economy." Appx1804 (citing *Russia Cold-Rolled Steel*, 81 Fed. Reg. at 49,935, and accompanying IDM at cmt. 7).

Similarly, in this case Commerce found that the Russian gas market "has yet to abandon domestic market price regulation in favor of developing market-based approaches." Appx1804-1805. Specifically, Commerce explained that Gazprom's 2019 annual report showed that during the relevant period of investigation, "Gazprom's pricing was not set based on market principles" because there were "government resolutions during the period negating any attempts that had been made to create a segment where pricing was set based on market principles." Appx1805 (citing Appx820). Thus, Commerce identified an "appropriate proxy" to determine a "market-based natural gas benchmark." Appx1805.

Commerce concluded that "the most appropriate proxy" that was available on the record was the European OECD export prices that were sourced from the International Energy Agency.  Appx1805.  Commerce then "derived average quarterly prices using the selected OECD European export market prices" and then used "an average quarterly exchange rate to convert the prices to rubles."  Appx1806.  Further, in order to approximate the price the firm would pay if it imported the product, including delivery charges and import duties, Commerce added a 20% Value Added Tax and a 5% import duty.  Appx1806 (citing Appx745).

On February 8, 2021, Commerce published its final determination in which it reached the same conclusions that it had in the preliminary determination regarding *de facto* specificity and the selection of the tier 3 benchmark and provided additional explanation.  *See generally* Appx1851-1867; *see also* Appx1883.  Following an affirmative injury determination by the United States International Trade Commission, Commerce published a countervailing duty order on phosphate fertilizers from Russia.  *Phosphate Fertilizers From the Kingdom of Morocco and the Russian* Federation, 86 Fed. Reg. 18,037 (Dep't of Commerce Apr. 7, 2021) (CVD Order), Appx1888.

## III. Proceedings Before The Trial Court

Following Commerce's final determination, EuroChem and PhosAgro filed lawsuits before the United States Court of International Trade challenging aspects of Commerce's decision. In September 2022, the trial court issued its decision in which it affirmed Commerce's determination that the provision of natural gas for less than adequate remuneration was *de facto* specific. Appx15. Addressing specificity, the court found, although "electricity, communal services, and households used greater amounts of natural gas, . . . in relation to other industrial users the agrochemical industry used significantly more than any other industry." Appx14 (citing Appx1787). Also, the court found that "{w}hen comparing only industrial users' purchases, the record reflects that the agrochemical industry purchased a far greater amount than any other industrial user." *Id.* Thus, the court found that the agrochemical industry was "a predominant user of the subsidy" for purposes of 19 U.S.C. § 1677(5A)(D)(iii)(II).

Turning to the benchmark, given the significant distortions that Commerce found in the Russian natural gas market, the court also sustained Commerce's use of a tier 3 benchmark as well as Commerce's use of a constructed benchmark based upon data from the International Energy Agency that the petitioner has placed on the record. Appx24-25. Specifically, the court found that "{t}he {International Energy Agency} data was a reasonable benchmark selection because

the data stated it was for industry users and would be comparable to natural gas for industrial use in Russia." Appx24 (citing Appx1864, Appx1485-1488).

The court did not sustain Commerce's decision in its entirety, however. The court remanded the matter for Commerce either to remove the added Value Added Tax and other import duties from the natural gas benchmark price or further to explain why it was reasonable to add additional Value Added Tax and import duties when Commerce has concluded that it is not possible to use tier 1 or tier 2 benchmarks. Appx26.

In its remand results, among other things, Commerce removed the Value Added Tax and import duties from its tier 3 benchmark calculation. Appx1891. Following additional briefing, the court remanded aspects of Commerce's decision that are not relevant to this appeal for further explanation or reconsideration. Appx46-47. Commerce filed its second remand results in October 2023, and the court sustained the second remand results and entered judgment. Appx69-70. This appeal followed.

## SUMMARY OF THE ARGUMENT

The trial court correctly held that Commerce's determination that the Government of Russia provided countervailable subsidies in the form of natural gas provided by Gazprom to producers of phosphate fertilizers for less than

11

adequate remuneration is supported by substantial evidence and is otherwise in accordance with law.

In sustaining Commerce's determination, the trial court properly concluded that the subsidy was *de facto* specific because the agrochemical industry purchased more natural gas than any other industrial user. Further the trial court sustained Commerce's finding that the provision of natural gas conferred a benefit because Gazprom set its prices in order to further the Russian government's social and economic goals rather than in accordance with market principles. The court also upheld Commerce's conclusion to select a proxy for market-based natural gas prices, in this case regional European OECD natural gas prices that were sourced from the International Energy Agency.

EuroChem contends that Commerce erred in examining specificity by comparing the agrochemical industry's use of natural gas to other industrial consumers. But EuroChem cannot avoid that the statute explicitly permits Commerce to find specificity when "{a}n enterprise or industry is a predominant user of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(II). The statute necessarily gives Commerce the discretion to determine whether a particular industry is a "predominant user." *Id.*

There is also no merit to EuroChem's arguments that Commerce's benefit analysis is contrary to law or unsupported by substantial evidence. Under a tier 3

benchmark analysis, Commerce evaluates whether prices are based on market principles. Here, given the evidence of the significant distortions in the Russian natural gas market, Commerce reasonably concluded that Gazprom's prices could not reflect market principles. Also flawed is EuroChem's contention that Commerce erred in relying on the International Energy Agency data for its constructed benchmark. As explained further below, the dataset that the respondents placed on the record was unreliable and, thus, unsuitable as a benchmark. Accordingly, the Court should affirm the judgment.

## ARGUMENT

### I. Standard Of Review

When reviewing the Court of International Trade's judgment concerning a final determination of Commerce, this Court reapplies the trial court's standard of review. *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005); *SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed. Cir. 2005). Accordingly, this Court will uphold Commerce's determination unless it is unsupported by substantial evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *Dupont Teijin*, 407 F.3d at 1215; *SNR Roulements*, 402 F.3d at 1361.

**II.    Commerce Reasonably Concluded That The Provision Of Natural Gas For Less Than Adequate Remuneration Was *De Facto* Specific**

Commerce reasonably concluded that the provision of natural gas by Gazprom was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(II) because the agrochemical industry is a predominant consumer of natural gas when compared to other industrial sectors.  Appx1800-1801, 1854.  Specifically, record evidence shows the agrochemical industry was in the top five consuming groups for 2019 and that "the agrochemical industrial sector accounted for the largest percentage of Gazprom's total domestic natural gas sales among industrial groups for 2019." Appx1854 (citing Appx1787).  EuroChem disagrees and asserts that Commerce's focus on industrial users produced "distorted results."  Applnt. Br. at 6, 9. Although EuroChem might have preferred that Commerce analyze the information differently, Commerce's conclusion is supported by substantial evidence and is accordance with law.  Thus, it should be sustained.

**A. Record Evidence Shows That The Agrochemical Industry Is A Predominant User Of Natural Gas**

A subsidy is *de facto* specific if and "one or more" of four statutory factors exist.  Among those factors is whether "{a}n enterprise or industry is a predominant user of the subsidy."  *Id.* at 19 U.S.C. § 1677(5A)(D)(iii)(II).  Further, "{i}f a single factor warrants a finding of specificity, {Commerce} will not undertake further analysis."  19 C.F.R. § 351.502(a).

In its investigation, Commerce requested purchase data (volume and value) for natural gas by industrial classification during the period of investigation. Appx1800; *see also* Appx728-729.  Although Russia responded that it did not maintain such statistics on industrial consumers' purchase of natural gas, in its first supplemental questionnaire response, Russia reported that in 2019 the fertilizer industry consumed 4.7% of Russia's total gas consumption.  Appx1800; *see also* Appx747, Appx1024.  Thus, Commerce requested additional information and the submission of alternate data that could be used to evaluate natural gas purchases based on the statistics that the government maintained.  Appx1800, Appx1784-1785.  In its response, Russia stated that it does not maintain such volume and value purchase data.  It referred Commerce to Gazprom's 2019 annual report as an alternative data source, because the annual report included information on Gazprom's domestic natural gas sales.  Appx1800, Appx1785-1789; *see also* Appx757-997.

The 2019 annual report shows that, according to Gazprom's data on the volumes of gas transported through its pipeline system in 2019, natural gas is heavily used in the agrochemical sector, which includes phosphate fertilizer producers, and that agrochemistry was in the top natural gas consuming groups for 2019.  Appx1800, Appx1787, Appx14-15.  There was no specific industrial sector

listed in the top consuming groups for 2019, but the agrochemical[1] industrial sector accounted for the largest percentage of total domestic natural gas sales among industrial groups in 2019.  Appx1800, Appx1787.  Because the information reported includes non-manufacturing sectors (*i.e.*, households, housing/utilities, and power generation/heating), Commerce compared the agrochemical industry with the next three largest industries' consumption of natural gas and to the "other" category of natural gas consumption during 2019.  Appx1854, Appx1800.  The next three largest industries, however, accounted for a small percentage, each less than half of the agrochemical industry, and even with the "other" category, the proportion of consumption for each group was still insignificant.  *Id.*  Further, as the trial court correctly found, for the agrochemical sector, natural gas is used both for power and also in the production of ammonia, which is "a component in the production of phosphate fertilizer" and fertilizer.  Appx15 (citing Appx1959-1960 and Appx1785-1787).

Commerce's approach was consistent with its determination in *Russia Cold-Rolled Steel*, in which the agrochemical sector was found to be a predominant user of natural gas.  Appx1854, Appx1800; *Russia Cold-Rolled Steel*, 81 Fed. Reg.

---

[1]  *See* Appx1854 (explaining "… the Agrochemical sector (which includes the Russian phosphate fertilizers industry) is the largest industrial consumer of natural gas sold by Gazprom in 2019, Commerce is continuing to find that the agrochemical sector, which includes phosphate fertilizer producers, is a predominant user of natural gas in Russia.").

49,935, and accompanying IDM at 48. Thus, the record reflects that the agrochemistry sector: (1) is the largest consumer of natural gas; (2) was in the top five consuming groups; and (3) when compared to all other reported groups, was still the predominant consumer of natural gas. Appx1854, Appx1800-1801. Therefore, consistent with 19 U.S.C. § 1677(5A)(D)(iii)(II)(iii), Commerce reasonably found that the provision of natural gas by Gazprom is *de facto* specific.

### B. EuroChem's Arguments Ignore The Relevant Statutory Language

EuroChem erroneously contends Commerce's determination is flawed because natural gas is broadly available in Russia and used throughout the Russian economy. Applnt. Br. at 10-13. It also emphasizes that, because the fertilizer industry in Russia consumes only 4.7% of Russia's total natural gas consumption, there is no reasonable interpretation of the word "predominant" in which the fertilizer industry is a predominant user. Applnt. Br. at 12. Similarly, EuroChem claims that Commerce's interpretation is contrary to the Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-216 (1994) (SAA) and *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,377 (Dep't of Commerce Nov. 25, 1998) (CVD Preamble), because it purportedly allows Commerce to impose countervailing duties on subsidies that are "widely available and widely used in the subject country." Applnt. Br. at 11-12. As

explained below, none of these arguments provides a basis for overturning Commerce's finding of *de facto* specificity.

EuroChem avoids that 19 U.S.C. § 1677(5A)(D)(iii)(II) explicitly permits Commerce to find that a subsidy is *de facto* specific if an enterprise or industry is a predominant user of the subsidy. Indeed, in *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999), this Court recognized that the statute affords Commerce substantial discretion in determining what companies are "predominant user{s}." In that case, this Court explained that "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." *Id.*

Here, as the trial court correctly found, Commerce possesses "discretion to determine what predominant means in the context of § 1677(5A)(D)(iii)." Appx15. And Commerce "reasonably chose to exclude certain users in order to evaluate predominate industrial use." *Id.* Specifically, when Commerce compared only industrial users' purchases "the record reflects that the agrochemical industry purchased a far greater amount than any other industrial user." *Id.* Thus, the agrochemical industry is a "predominant user of the subsidy." *Id.* (citing 19 U.S.C. § 1677(5A)(D)(iii)(II)).

Given the record evidence showing that the agrochemical industry purchases "a far greater amount {of natural gas} than any other industrial sector," Appx15, under EuroChem's definition, substantial evidence supports that the agrochemical sector is the "most frequent or common" user from among the industrial sectors. Applnt. Br. at 12 (citing the dictionary definition of "predominant"). Appx1854, Appx1800.

Further, Commerce's methodology has been upheld as reasonable by the Court of International Trade in other cases. For example, in *ArcelorMittal USA LLC v. United States*, 399 F. Supp. 3d 1271, 1283 (Ct. Int'l Trade 2019), Commerce provided evidence that the metallurgy sector is "a predominant user" of the natural gas subsidy and thus met the *de facto* specificity criteria of 19 U.S.C. § 1677(5A)(D)(iii)(II). In *ArcelorMittal*, Commerce concluded that the metallurgy industry (1) "'heavily used' natural gas and accounted for four percent of Gazprom's total sales in 2013"; (2) was "one of the top six sectors that accounted for Gazprom's 2013 domestic natural gas sales"; and (3) was "the only industrial manufacturing sector whose consumption of Gazprom's natural gas is separately listed in the annual report." *ArcelorMittal*, 399 F. Supp. 3d at 1283. Similarly, here, the record shows that natural gas is heavily used in the agrochemistry sector and that agrochemistry was in the top natural gas consuming groups for 2019; no

other specific industrial sectors were listed in the top consuming groups.

Appx1854, Appx1800, Appx1785-1789.

Nor does the SAA support EuroChem's arguments. The SAA recognizes that Commerce's *de facto* specificity analysis is likely to vary from case to case, but that the statute "makes clear that Commerce shall find *de facto* specificity if one or more of the factors {in § 1677(5A)(d)(iii)} exists." SAA, H.R. Doc. No. 103-216 at 930-931; *see also* CVD Preamble, 63 Fed. Reg. at 65,358 (declining to further explain the purpose of the specificity test). As explained above, Commerce found that the criteria in 19 U.S.C. § 1677(5A)(D)(iii)(II) were satisfied, and, thus, found the provision of natural gas to be *de facto* specific.

For these reasons, the Court should sustain Commerce's conclusion that the provision of natural gas was *de facto* specific.

## III. Commerce's Conclusion That Gazprom's Prices Were Not Set In Accordance With Market Principles Is Supported By Substantial Evidence And Is In Accordance With Law

EuroChem erroneously contends that Commerce erred when it failed to evaluate the adequacy of remuneration, that is "payment of an amount that reflects the value of what is being paid for." *Nucor v. United States*, 927 F.3d 1243, 1250 (Fed. Cir. 2019) (discussing the definition); Applnt. Br. at 13-17. But the record documents Commerce's analysis of whether Russian natural gas prices were set in accordance with market principles. Specifically, Commerce explained that

fundamental distortions in the Russian market showed that natural gas prices were
not set in accordance with market principles. Appx1863-1864, Appx1804-1805.
EuroChem's mere disagreement with Commerce's analysis does not establish
agency error.

### A. Commerce May Consider Distortions In The Market When Analyzing Whether Prices Are Set In Accordance With Market Principles

Contrary to EuroChem's assertions, nothing in the statute, Commerce's
regulations, or the CVD preamble *requires* Commerce to adhere to any rigid set of
factors when performing its tier 3 benchmark analysis. As explained above,
Commerce turns to a tier 3 analysis when actual market determined prices (the tier
1 benchmark) and world market prices that are available to purchasers in Russia
(the tier 2 benchmark) are unavailable. 19 C.F.R. §§ 351.511(a)(2)(i)-(ii). Thus,
"by its nature, the {tier 3 market principles} analysis depends upon available
information concerning the market sector at issue and, therefore must be developed
on a case-by-case basis." Appx1863-1864.

Consequently, there is no merit to EuroChem's claim that Commerce cannot
consider government-created market distortions when analyzing whether
government prices are set in accordance with market principles. Applnt. Br. at 16.
Commerce's regulations make clear that there is no set analysis under a tier 3
benchmark and that Commerce "will normally measure the adequacy of

remuneration by assessing whether the government price is consistent with market principles.  19 C.F.R. § 351.511(a)(2)(iii).

The CVD preamble further supports that Commerce retains a significant amount of discretion and flexibility when performing its tier 3 benchmark analysis. Although Commerce's analysis is "normally" based upon an analysis of such factors as "the government's price-setting philosophy, cost (including rates of return sufficient to ensure future operations), or possible price discrimination," those factors are neither mandatory nor exhaustive.  CVD Preamble, 63 Fed. Reg. at 65,378; *see also* Appx1863-1864.  Specifically, Commerce explained that the factors are not listed "in any hierarchy" and that "the circumstances of each case vary widely."  CVD Preamble, 63 Fed. Reg. at 65,378.  As explained further below, here Commerce elected to consider distortions in Russian natural gas market, which demonstrated that the natural gas prices were not set in accordance with market principles.

Finally, this Court's decision in *Nucor v. United States*, 927 F.3d at 1251-52 does not show any error in Commerce's decision.  *See* Applnt. Br. at 17.  In *Nucor*, although the Court rejected one aspect of Commerce's tier 3 analysis, the Court otherwise affirmed Commerce's determination that the government of Korea's provision of electricity was in accordance with market principles.  *Id.* at 1256.  In doing so, the Court did not prescribe a methodology that Commerce must follow

other than to say that Commerce could not find that the government price was based on market principles based solely on the fact that the producers and exporters in the relevant industry did not receive a preferential rate. *Id.* at 1252. Conversely, here, Commerce concluded that because of fundamental distortions in the market, the Gazprom prices necessarily were not designed to reflect market principles. Appx1805, Appx1864-1865. Thus, nothing in Commerce's decision runs contrary to this Court's holding in *Nucor*.

### B. Substantial Evidence Supports Commerce's Conclusion That Russian Prices Were Not Set In Accordance With Market Principles

EuroChem wrongly asserts that "Commerce failed to provide any explanation for departing from its normal analysis under {t}ier 3." Applnt. Br. at 16. As explained above, Commerce did not depart from its "normal analysis." But even if it did, contrary to EuroChem's assertions, both the preliminary and final determinations identify substantial record evidence supporting Commerce's conclusion that Gazprom's natural gas prices were not consistent with market principles. Appx1804-1805, Appx1863-1864.

For its tier 3 benchmark analysis, Commerce explained that the "Russian natural gas market is distorted and that as a result, the prices charged by private suppliers cannot provide a basis for determining whether Gazprom's prices are

market-based." Appx1864.[2] To confirm the correctness of its factual finding,

Commerce also cited its preliminary determination in which it relied upon *Russia*

*Cold-Rolled Steel*, 81 Fed. Reg. 49,935 and accompanying IDM at cmt. 7.

Appx1864, Appx1804. In *Russia Cold-Rolled Steel*, Commerce concluded that

Gazprom's prices are not set in a matter that is consistent with market principles.

Appx1804. In that determination, Commerce cited statements from the Gazprom

annual reports which supported that "{t}he existing gas market model has a

number of fundamental flaws that prevent further competition" such as "high share

of the regulated segment in the gas market, unsustainable wholesale prices, and

interregional cross-subsidies affecting regional gas pricing." Appx1804 (citing

*Russia Cold-Rolled Steel*, 81 Fed. Reg. 49,935 and accompanying IDM at cmt. 7).

Commerce found that, Gazprom, "as the biggest gas supplier to the Russian

market, sold the bulk of its gas supplies at regulated process, which were set below

the sustainable level to bolster the national economy." *Id.* And Commerce

identified other statements that supported distortions in the natural gas market such

as "artificially low regulated prices" and "stalled progress towards fair gas pricing"

that Commerce found further showed that Gazprom's prices "were not set in a

---

[2] Although EuroChem implies that Commerce's tier 3 analysis is redundant of its tier 1 analysis, the analyses are different. Appx1859-1860 (citing Appx737-739 and Appx745-746), Appx1801-1802; *see also* Appx20-21. Unlike its tier 3 analysis, Commerce's tier 1 benchmark analysis focused on the fact that Gazprom accounted for a substantial portion of the natural gas market in Russia.

manner that is consistent with market principles." *Id.* Thus, Commerce concluded that these "admissions by Gazprom" that showed that Gazprom set prices at "below the sustainable level to bolster the national economy" demonstrated that "the natural gas prices are not based on market principles, but rather on the government's social and economic development goals." *Id.*

Similar to the types of evidence identified in *Russia Cold-Rolled Steel*, on this record Commerce found evidence demonstrating that "the systemic fundamentals of Gazprom's price setting have not changed." Appx1804. Specifically, that Gazprom continued to sell most of its gas supplies at regulated prices in order to further the Russian government's "social and economic development goals" and not market principles. *Id.*[3] Commerce also identified statements on the record from Gazprom's 2019 annual report which Commerce found confirmed that Gazprom's pricing was not based upon market principles and that there were "government resolutions during the period negating any attempts that had been made to create a segment of the market where pricing was set based on market principles." Appx1805 (citing Appx820).

---

[3] Although Appx1804 cites to pages 59 of the IDM in *Russia Cold-Rolled Steel*, Commerce intended to cite page 38 of the IDM in that decision as well as Appx1961.

## C. EuroChem's Mere Disagreement With Commerce's Analysis Does Not Establish Reversible Error

As explained above, Commerce, based on record evidence, reasonably concluded that Gazprom's prices did not reflect market principles. EuroChem contends, incorrectly, that Commerce failed to consider record evidence such as the Government of Russia's questionnaire responses and the *Brattle Report*, a report that was submitted by PhosAgro during the investigation. But EuroChem's disagreement does not establish that Commerce's decision is unsupported by substantial evidence.

First, there is no merit to EuroChem's claim that Commerce could and should have conducted a more thorough market principles analysis based upon information contained in the Government of Russia's questionnaire response, Appx749-51, and the *Brattle Report*, a report that PhosAgro had commissioned for purposes of the investigation. Applnt. Br. at 15. As this Court recognized in *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006), underdeveloped arguments are waived. *Id.* Here, other than citing the Government of Russia's questionnaire responses in a conclusory fashion, EuroChem fails to explain how Commerce could have conducted an adequacy of remuneration analysis based upon the information contained at Appx749-751. Nor does EuroChem explain how the questionnaire responses undermine the record evidence supporting that the Russian natural gas market is distorted, under the

deferential substantial evidence standard. *Id.* Thus any argument based upon the questionnaire responses is waived. *SmithKline Beecham*, 439 F.3d at 1320.

Commerce explained that the *Brattle Report* was unsuitable for use for several reasons. Appx1864, Appx1866. Specifically, the information was "contradictory to information provided by parties directly" and was "not accompanied by original source documentation describing the methodology and underlying sources of data." *Id.*; *see generally* 19 U.S.C. § 1677m(e)(2), (3) (recognizing that Commerce is not required to consider information that cannot be verified or is so incomplete as to be unreliable).

Thus, based on its consideration of record evidence, Commerce concluded that Russian natural gas prices were not set in accordance with market principles. EuroChem's disagreement with Commerce's determination that Gazprom prices were not set in accordance with market principles and its weighing of record evidence is insufficient to overcome the substantial evidence standard, which requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). Here, substantial evidence supports Commerce's conclusion that the natural gas market in Russia was fundamentally distorted and that prices were set to achieve strategic goals and not to ensure the adequacy of remuneration. It is not this Court's role to reweigh that evidence. *Matsushita Elec. Indus. Co., Ltd. v.*

*United States*, 750 F. 2d 927, 933 (Fed. Cir. 1984); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

## IV. Commerce's Use Of A Constructed Benchmark Price Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

EuroChem's challenges to Commerce's use of International Energy Agency data as its tier 3 benchmark are also unpersuasive. As the trial court correctly concluded, Commerce's construction of its tier 3 benchmark using International Energy Agency data is supported by substantial evidence and is otherwise in accordance with law. Appx23-24.

### A. Commerce Reasonably Selected European International Energy Agency Data In Calculating The Tier 3 Benchmark

When, as here, Commerce determines that the government price is inconsistent with market principles, it constructs an external benchmark. Appx23 (citing *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1389 n.6 (Ct. Int'l Trade 2021)); *see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S., et al. v. United States*, 459 F. Supp. 3d 1341, 1348 n.13 (Ct. Int'l Trade 2021). As the trial court correctly recognized, "Commerce's goal in setting a benchmark rate is to best approximate the market rate . . . not to choose the rate respondents were most likely to pay" in a market that is distorted as a result of government interference. Appx23 (quoting *Changzhou Trina Solar Energy Co., Ltd., v. United States*, 352 F. Supp. 3d 1316, 1343 (Ct. Int'l Trade 2019)).

28

"When Commerce is faced with the decision to choose between two alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly if their selection is reasonable." *Timken Co. v. United States*, 788 F. Supp. 1216, 1220 (Ct. Int'l Trade 1992); *see also Heze Huayi Chem. Co. v. United* States, 532 F. Supp. 3d 1301, 1326 (Ct. Int'l Trade 2021) ("The record shows that Commerce exercised properly its broad discretion in selecting the best available information for the record from a reliable database.").

Here, Commerce found that the most appropriate proxy for a market-based natural gas benchmark was European OECD natural gas prices sourced from the International Energy Agency. Appx1805, Appx1864, Appx24. As Commerce explained, unlike the pricing information contained in the *Brattle Report*, which was the only other data on record and which Commerce found to be unreliable, the International Energy Agency and European OECD natural gas prices state the price data for the natural gas industry and have been used in other cases. Appx1864 (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg, 16,056 (Dep't of Commerce Mar. 20, 2020) (final affirm. countervailing duty determ.) and accompanying IDM at 18-26); Appx23 (citing *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1371 (Ct. Int'l Trade 2021) and *Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d

1371 (Ct. Int'l Trade 2019)).  Thus, Commerce reasonable selected the European

International Energy Agency data for the calculation of the tier 3 benchmark.

### B.      Commerce Was Not Required To Make Additional Adjustments To The International Energy Agency Data

EuroChem erroneously claims that Commerce erred because it is statutorily

required to make an adjustment to account for the fact that Russia has an

abundance of natural gas.  Applnt. Br. at 17-19 (citing 19 U.S.C. § 1677(5)(E)(iv)).

This vague argument is flawed for several reasons.

First, EuroChem neither proposes a specific adjustment, nor identifies

useable data that it or any other respondent placed on the record that would have

allowed Commerce to have made that adjustment.  *Arunachalam v. IBM Corp.*,

989 F.3d 988, 999 (Fed. Cir. 2021) (concluding that "insufficiently developed"

arguments are waived) (citing *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341

(Fed. Cir. 2006)).  As the trial court correctly explained, "{t}he aim of the {tier 3}

analysis was not to precisely estimate the price of natural gas, but to determine the

market value for natural gas as consumed in Russia, relying on what data are

available on the record."  Appx24.  Here, as explained in the preceding section, the

only data that the respondents placed on the record is the *Brattle Report*, which, for

the reasons explained at page 26 above, Commerce found was "unreliable," and

thus unsuitable for the tier 3 benchmark.  Appx24.

Second, although EuroChem criticizes Commerce for not providing an explanation as to why "no adjustments were necessary" to reflect prevailing market conditions in Russia, EuroChem also failed to produce any evidence rebutting Commerce's conclusion that "there was no evidence that natural gas produced in Russia and sold in Europe was distorted." Appx24 (citing Appx1866). If EuroChem believed that further adjustments were required, EuroChem should have developed the record to substantiate its claim. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1325 (Fed. Cir. 2011) (explaining that judicial review is based upon the existing record). Because it failed to develop the record below, it cannot now complain about the facts Commerce found on the record available.

Further, as the trial court correctly found, it is reasonably discernible from Commerce's decision that it found that the International Energy Agency data "was a reasonable benchmark because the data stated that it was for industry users and would be comparable to natural gas for industrial use in Russia." Appx24 (citing Appx1864 and *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). This analysis satisfies Commerce's burden to explain how its benchmark relates to prevailing conditions in the Russian market. 19 U.S.C. § 1677(5)(E)(iv). Having identified no record evidence that rebuts that conclusion or otherwise provides a reliable basis for calculating the tier 3 benchmark, there is

no merit to EuroChem's arguments that commerce erred in its tier 3 benchmark calculation. Accordingly, the Court should sustain the trial court's judgment.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the trial court's judgment.

Respectfully submitted,

BRIAN R. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim by Tara K.
Hogan
L. MISHA PREHEIM
Assistant Director

/s/ Elizabeth Anne Speck
ELIZABETH ANNE SPECK
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-0369
Facsimile: (202) 305-1571

OF COUNSEL:
JARED M. CYNAMON
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance
Department of Commerce
Washington, DC 20230

July 17, 2024

Attorneys for Defendant-Appellee
United States

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify that the foregoing brief contains 6,645 words, excluding the parts of the brief exempted by the rule. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

/s/  Elizabeth Anne Speck