2024-1593, 2024-1595

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

THE MOSAIC COMPANY,
*Plaintiff-Appellee*

v.

UNITED STATES,
*Defendant-Appellee*

v.

PHOSAGRO PJSC, JSC APATIT, INDUSTRIAL
GROUP PHOSPHORITE, LLC,
*Defendants-Appellants*

Appeal from the United States Court of International Trade in
Case Nos. 1:21-cv-00117-JAR, 1:21-cv-00220-JAR,
1:21-cv-00221-JAR, Senior Judge Jane A. Restani

## REPLY BRIEF OF DEFENDANT-APPELLANT
INDUSTRIAL GROUP PHOSPHORITE LLC

Jeremy William Dutra

**SQUIRE PATTON BOGGS (US) LLP**
2550 M Street, NW
Washington, DC 20037
202-626-6237

*Counsel to Industrial Group
Phosphorite LLC*

Dated: August 7, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I. ARGUMENT ............................................................................................1

    A. Commerce cannot defend its *de facto* specificity finding because its approach of comparing the agrochemical industry's natural gas usage to only other industrial users instead of all users of natural gas is contrary to the countervailing duty statute. ...............................................................1

    B. Commerce cannot justify its refusal to engage in its normal practice to evaluate whether Gazprom's natural gas prices are consistent with market principles. .......................................................6

    C. EuroChem did not waive any issue presented in this appeal. .............11

    D. Commerce's use of the IEA pricing data to assess the adequacy of remuneration for natural gas in Russia is contrary to statute. ................................................................................................13

II. CONCLUSION ......................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Atl. Sugar, Ltd. v. United States,* 744 F. 2d 1556 (Fed. Cir. 1984) ..........................9
*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)........................9
*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed.Cir.2003).....................13
*E.I. DuPont de Nemours & Co. v. United States*, 22 C.I.T. 19 (1998)....................10
*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409 (2005)..........................................................................2
*Itochu Bldg. Prod. v. United States*, 733 F.3d 1140 (Fed. Cir. 2013) .....................13
*Jiaxing Brother Fastener Co. v. United States*, 428 F. Supp. 3d 1364 (CIT 2020) ..........................................................................................................10
*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ......................................5
*Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329 (CIT 2018) .....12
*Timken Co. v. United States*, 26 CIT 1072 (2002).................................................12
*Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328 (CIT 2015)..12

**Statutes**

19 U.S.C. § 1677(5)(B)................................................................................................4
19 U.S.C. § 1677(5)(E)(iv) ........................................................................................14
19 U.S.C. § 1677(5A) .................................................................................................4
19 U.S.C. § 1677(5A)(D)............................................................................................3
19 U.S.C. § 1677(5A)(D)(iii)(II) ................................................................................4

**Regulations**

19 C.F.R. § 351.102(21) .............................................................................................8
19 C.F.R. § 351.301(c)(3)(i) .......................................................................................8
19 C.F.R. § 351.511(a)(2)...........................................................................................8
19 C.F.R. § 351.511(a)(2)(i) .......................................................................................6
19 C.F.R. § 351.511(a)(2)(ii) ......................................................................................6
19 C.F.R. § 351.511(a)(2)(iii)......................................................................................7

**Legislative and Administrative Materials**

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348 (Dep't of Commerce Nov. 25, 1998)...................................................................................5

Uruguay Round Agreements Act, Statement of Administrative
 Action, H.R. Doc. No. 103–216 (1994) reprinted in 1994
 U.S.C.C.A.N. 4040 ....................................................................1, 5, 6, 7, 10, 11

I. **ARGUMENT**

   A. **Commerce cannot defend its *de facto* specificity finding because its approach of comparing the agrochemical industry's natural gas usage to only other industrial users instead of all users of natural gas is contrary to the countervailing duty statute.**

Commerce does not dispute that the purpose of the specificity test is "to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout the economy." Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103–216 (1994) reprinted in 1994 U.S.C.C.A.N. 4040. *Compare* Opening Br. at 11 *with* Resp. Br. at 14-19.

Commerce also does not dispute that natural gas is widely available in Russia. Nor does it dispute that all sectors of the Russian economy use natural gas. *Compare* Opening Br. at 11-12 (citing Appx 819, Appx1024, Appx 1030-33, Appx 1786) *with* Resp. Br. at 14-19. Commerce does not dispute that the largest users in Russia of natural gas in 2019 were electricity and heat generation and households, which collectively used over 54 % of natural gas consumed in Russia. *Compare* Opening Br. at 9 (citing Appx819, Appx1786) *with* Resp. Br. at 14-19. Against this backdrop, Commerce does not dispute that the agrochemical industry's 4.7% usage is not predominant when compared against all Russian users of natural gas. *Compare* Opening Br. at 12 *with* Resp. Br. at 14-19. Indeed, as the CIT observed—and Commerce does not challenge—the agrochemical industry "purchased only a small

1

percentage of Gazprom's total {domestic} natural gas sales" when compared to all Russian users of natural gas. *Compare* Appx15 *with* Resp. Br. at 14-19.

The dispute in this appeal accordingly centers on whether Commerce can find that the agrochemical industry is the predominant user of natural gas solely by comparing its usage among only a subset of natural gas users—*i.e.*, industrial users—as opposed to all users of natural gas. Commerce fails to engage in any statutory analysis supporting its position. And it cannot do so because its approach is unmoored from the statutory text.

Congress authorized Commerce to find a subsidy *de facto* specific if "{a}n enterprise or industry is a predominant user of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(II). Usage by the enterprise or industry at issue must be compared against something, and Commerce does not—and cannot—cite any statutory language that permits it to evaluate the predominance of a particular industry's subsidy usage by artificially narrowing the comparison to a subset of subsidy users within the subject country economy.

Commerce, moreover, ignores that the "predominant use" factor for determining *de facto* specificity must be read within the context of the entire statutory provision addressing specificity. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415 (2005) ("Statutory language has meaning only in context"). This provision, through its

preamble language, requires Commerce to determine whether a subsidy is a "specific subsidy . . . to an enterprise or industry <u>within the jurisdiction of the authority providing the subsidy</u>." 19 U.S.C. § 1677(5A)(D) (emphasis added). Commerce fails to address this text, rebut EuroChem's argument, or otherwise engage in any statutory analysis. *Compare* Opening Br. at 10-11 *with* Resp. Br. at 14-19.

Viewing the predominant use factor within the entire statutory framework confirms that Commerce must evaluate whether a particular enterprise or industry is the predominant user of the subsidy within the jurisdiction of the government authority. Here, given that Gazprom is the largest producer and supplier of natural gas in Russia and supplies natural gas throughout all sectors of the Russian economy, the statute required Commerce to evaluate whether the Russian fertilizer industry was the predominant user of natural gas as compared to all natural gas consumers within Russia. Commerce makes no effort to address, let alone refute, this reading of the statute.

Mosaic contends that evaluating the agrochemical industry's natural gas usage to only a subset of natural gas users in Russia is sanctioned by the qualifying language that "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D). Mosaic Br. at 25. Mosaic misreads the provision. Read in context, the statute provides only that Commerce may consider a subsidy *de facto*

3

specific if "{a}n enterprise or industry {or a group of such enterprises or industries} is a predominant user of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(II). In other words, the statute's reference to "an enterprise or industry," or even a group of enterprises of industries, speaks to the numerator. The denominator must be <u>all users</u> of the subsidy because Congress directed Commerce to determine specificity within the context of "the jurisdiction of the authority providing the subsidy" and an "authority" is "a government of a country or any public entity within the territory of the country." 19 U.S.C. §§ 1677(5)(B) and 1677(5A).

Commerce's *de facto* specificity finding would be correct if the statute read that Commerce may find a subsidy *de facto* specific if "{a}n enterprise or industry {or a group of such enterprises or industries} is a predominant user of the subsidy <u>among a group of enterprises or industries</u>." It does not say that. And Commerce cannot revise or interpret the statute otherwise.

At its essence, Commerce argues that it has "substantial discretion" in determining what companies are "predominant users," and that the CIT found Commerce reasonably narrowed its evaluation from all users of natural gas to a subset of users. Resp. Br. at 17-19. But it was improper for the CIT to simply defer to Commerce's reading of the statute as reasonable. As the Supreme Court recently emphasized, it is the obligation of the judiciary to interpret a statute and decide

whether the executive agency complied with the statute. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

Underscoring that Commerce failed to comply with the statute is that its analysis led to a result contrary to the stated purpose of the specificity test. That purpose is to avoid imposing countervailing duties on subsidies widely available and widely used in the subject country economy. *See* SAA, 1994 U.S.C.C.A.N. 4040. Commerce's approach also violates Commerce's stated view of the specificity test when it issued its countervailing duty regulations; namely, that "subsidies that are distributed very widely throughout the economy are not countervailed." *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,357 (Dep't Commerce Nov. 25, 1998).

Properly framed, there is no dispute—nor could there be any dispute—that the agrochemical industry's 4.7% usage of natural gas in 2019 does not make it a predominant user of natural gas within Russia, particularly given electricity and heat generation used 35%, households and housing used 19%, the oil industry used 9%, and the metals industry used 6%. Appx758.

Unmoored from the statute, Commerce's *de facto* specificity determination should be rejected as contrary to law and unsupported by substantial evidence.

### B. Commerce cannot justify its refusal to engage in its normal practice to evaluate whether Gazprom's natural gas prices are consistent with market principles.

Commerce concedes that it "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." Resp. Br. at 21-22. Commerce further acknowledges that in so doing, it will analyze such factors as "the government's price-setting philosophy, cost (including rates of return sufficient to ensure future operations), or possible price discrimination." *Id.* at 22. Commerce nevertheless dismisses performing an analysis of the factors it outlined in its countervailing duty rulemaking because of "distortions" in the Russian natural gas market caused by the Government of Russia's involvement. *Id.* at 22-23. But that is a *non sequitur*.

Commerce's "preference is to compare the government price to market-determined prices stemming from actual transactions within the country," *i.e.*, tier 1 benchmark. *Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,377; *see also* 19 C.F.R. § 351.511(a)(2)(i). "Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market," Commerce "will turn to world market prices that would be available to the purchaser." *Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,377; *see also* 19 C.F.R. § 351.511(a)(2)(ii). If world market prices are unavailable, then Commerce "will normally measure the adequacy of remuneration by assessing whether the

government price is consistent with market principles. *Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,377; *see also* 19 C.F.R. § 351.511(a)(2)(iii).

The very reason Commerce resorts to a tier 3 analysis is because it finds actual in-country transaction prices unreliable based on market distortions caused by government involvement. If distortion caused by government involvement is a reason for departing from Commerce's normal practice under tier 3, then it is difficult to envision when Commerce would ever engage in its "normal" practice.

Commerce's argument, moreover, does not withstand scrutiny. Even if the GOR's involvement in the natural gas market through ownership interests in Gazprom and Rosneft distorted the market, that does not prevent Commerce from analyzing the government's price-setting philosophy or costs (including rates of return sufficient to ensure future operations). As EuroChem explained, Commerce had the information to conduct this analysis because it obtained data from the GOR through questionnaire responses. Opening Br. at 15.

Commerce faults EuroChem for not explaining how Commerce could have conducted an adequacy of remuneration analysis based on the GOR's questionnaire responses and suggests EuroChem accordingly waived that argument. Resp. Br. at 26. But Commerce misses the mark. The *Brattle Report* specifically performed Commerce's "normal analysis" under tier 3, evaluating whether Gazprom's natural prices are set in accordance with market principles by evaluating whether it can

cover its costs of supply (one of the factors Commerce lists). Opening Br. at 1 (citing Appx1679-80, Appx1698-1708). And in conducting this analysis, the *Brattle Report* relied on record data the GOR submitted in this investigation, including Gazprom's annual reports and financial statements. Appx1698-1708, Appx1724. In other words, the *Brattle Report* demonstrated, using data Commerce collected during the investigation, how Commerce could have—and should have—conducted its normal analysis under tier 3.

Unable to rebut EuroChem's argument, Commerce retorts that its complete dismissal of the *Brattle Report* was appropriate because EuroChem and PhosAgro "commissioned {it} for purposes of the investigation." Resp. Br. at 26; *see also* Appx1864. Left unsaid in its brief—or in its final determination—is why the timing or purpose for preparing information for an investigation has any bearing on whether Commerce may consider it. Indeed, Commerce's regulations concerning benchmark submissions do not prohibit or otherwise define "factual information" as excluding benchmark analyses from third-party experts. *See generally* 19 C.F.R. §§ 351.102(21), 351.301(c)(3)(i), 351.511(a)(2). Nor can Commerce cite to any consistent practice in dismissing a benchmark submission merely because it was prepared for purposes of the investigation. Appx1864.

Commerce further contends its disregard of the *Brattle Report* was justified because the report "is contradictory to information provided by parties directly."

Resp. Br. at 27; *see also* Appx1866. But Commerce never identified the supposedly contradictory information—either in the *Brattle Report* or in other submissions by the parties. A mere conclusion without identifying the factual basis for the conclusion does not comply with Commerce's obligations. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *Atl. Sugar, Ltd. v. United States,* 744 F. 2d 1556, 1562 (Fed. Cir. 1984).

Commerce also complains that the *Brattle Report* was "not accompanied by original source documentation describing the methodology and underlying sources of data." Resp. Br. at 27. *See also* Appx1866. But Commerce again misses the mark. Beyond evaluating Gazprom's costs, the *Brattle Report* alternatively outlined European Hub pricing as a tier 3 benchmark against which to assess the adequacy of remuneration. Appx1709-14. This particular criticism of not including source documentation or describing the methodology was in the context of rejecting respondents' argument that Commerce should use the European Hub prices calculated by the *Brattle Report* in lieu of IEA prices or average the European Hub prices and IEA prices for the tier 3 natural gas benchmark. Appx1864, Appx1868.

Commerce never in its final determination addressed the analysis in the *Brattle Report* that examined Gazprom cost data from the administrative record to determine if Gazprom's prices are set in accordance with market principles. Commerce instead merely waived its hand, arguing that it did not have to engage in

9

its normal practice under tier 3 because the GOR's involvement distorted the natural gas market. But this does not relieve Commerce of engaging in its normal analysis under tier 3. As explained, the very reason Commerce resorts to a tier 3 benchmark is due to distortion caused by the government. *Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,377.

Commerce tries to justify its approach in the phosphate fertilizer investigation as consistent with its approach in the *Russia Cold-Rolled Steel* investigation. Resp. Br. at 23-24. But the *Russia Phosphate Fertilizer* investigation was an independent proceeding with a separate record, and it was incumbent on Commerce to evaluate the facts submitted in *this* record to evaluate the provision of natural gas for less than adequate remuneration. *E.I. DuPont de Nemours & Co. v. United States*, 22 C.I.T. 19, 32 (1998); *Jiaxing Brother Fastener Co. v. United States*, 428 F. Supp. 3d 1364, 1379-80 (CIT 2020) ("The agency must make its determinations based on the record before it").

To justify abandoning its normal practice under tier 3, Commerce observes that "Gazprom continued to sell most of its gas supplies at regulated prices in order to further the Russian government's social and economic development goals." Resp. Br. at 25. This is no justification at all. Even if certain Gazprom natural gas sales are at prices fixed by the GOR, there is no dispute that Gazprom also sells natural gas in the unregulated market at prices not regulated by the GOR. Appx819.

According to Commerce, moreover, it is in those situations where the government "is the sole provider of a good or service" that it "will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." *Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,378. Commerce never reconciles the reason for its departure from its normal practice with its statement in its countervailing duty rulemaking. Such a radical departure is neither supported by substantial evidence or in accordance with law. It is arbitrary and capricious and should be set aside.

### C. EuroChem did not waive any issue presented in this appeal.

Mosaic contends that EuroChem did not make its statutory interpretation argument in its case brief before Commerce and thus waived the argument on appeal for failing to exhaust its administrative remedies. Mosaic Br. at 21-22. Mosaic further contends that EuroChem waived its argument that Commerce should have evaluated Gazprom's pricing under tier 3 because EuroChem did not raise this issue in its case brief before Commerce. *Id.* at 28-29. Mosaic is wrong on both counts.

First, Mosaic made no argument to the CIT in its own briefing about the lack of administrative exhaustion by EuroChem under 28 U.S.C. § 2637(d), even though the CIT invited such issues to be addressed. *Compare* Appx2054-55 *with*

Appx2057-66.  Mosaic offers no justification for having this Court consider this issue in the first instance, particularly when Mosaic failed to avail itself of the opportunity to raise the issue with the CIT.

Second, the exhaustion doctrine does not apply here.  While EuroChem did not present the specificity or Gazprom issues in its case brief before Commerce, the other respondents presented these issues in their respective case briefs.  *See* Appx2043-45; Appx2047-53.  The CIT previously recognized that even if the litigating party did not itself raise an issue in its briefing before Commerce, there is no exhaustion issue if another party's "case brief presented the argument." *Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329, 1351 n.10 (CIT 2018); *see also Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1351 (CIT 2015) ("One well recognized exception to the doctrine of exhaustion permits a party to litigate an issue that the party did not exhaust at the administrative level where that issue was raised before the agency by a different party").

Because the litigated issues were presented to Commerce, the agency plainly considered both arguments in its final determination.  Appx1851-55; Appx1862-64.  As the CIT recognizes, a party "may be excused from its failure to raise the issue before Commerce {where} Commerce in fact considered the issue." *Timken Co. v. United States*, 26 CIT 1072, 1080 (2002), *aff'd*, 354 F.3d 1334 (Fed. Cir. 2004).

Further undermining Mosaic's argument is the "pure question of law" exception to the exhaustion doctrine. That exception applies here because both the specificity and Gazprom pricing issues "can be addressed without further factual development or further agency exercise of discretion." *Itochu Bldg. Prod. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013); *see also Consol. Bearings Co. v. United States,* 348 F.3d 997, 1003 (Fed.Cir.2003) (exhaustion doctrine exception applies where "{s}tatutory construction alone is { } sufficient to resolve {the} case").

Mosaic's waiver argument is both untimely and without merit.

### D. Commerce's use of the IEA pricing data to assess the adequacy of remuneration for natural gas in Russia is contrary to statute.

Commerce does not dispute that the IEA prices it used as the tier 3 benchmark are "prices for natural gas sold in Europe" and reflect "the market dynamics in <u>that</u> market." Appx1866 (emphasis added). Commerce also does not dispute that that the European prices it used are driven by different supply and demand conditions than those that exist in Russia. *Compare* Appx1520-21 and Appx1494 *with* Appx737-38. Nor does Commerce dispute that the short supply conditions in Europe result in higher prices as compared to Russia where natural gas is in abundant supply relative to demand. *Compare* Opening Br. at 19 (citing Appx737-38; Appx1520-21; Appx1491-1504; Appx1520-21; Appx1541-42; Appx1550; Appx1620-21; Appx1626; Appx1642-43) *with* Resp. Br. at 28-31.

Instead of grappling with these facts, Commerce ignores them. According to Commerce, it was appropriate to use IEA prices for the natural gas benchmark because this data set has "been used in other cases." Resp. Br. at 29. Commerce further trumpets the CIT's observation that "{t}he aim of the {tier 3} analysis was not to precisely estimate the price of natural gas, but to determine the market value for natural gas as consumed in Russia, relying on what data are available in the record." Resp. Br. at 30. This is not a game of survivor, however, where Commerce can use a benchmark merely because it is all that is left after rejecting other data.

Commerce must comply with the statute. And the statute commands Commerce determine the adequacy of remuneration "in relation to prevailing market conditions for the good . . . being provided . . . <u>in the country which is subject to the investigation or review</u>." 19 U.S.C. § 1677(5)(E)(iv) (emphasis added). Commerce admits that the data it used reflects the prevailing market conditions for natural gas in <u>Europe</u>, not <u>Russia</u>. Usage of the IEA data as the natural gas benchmark was plainly contrary to law.

## II. CONCLUSION

For the foregoing reasons and the reasons outlined in its Opening Brief, EuroChem respectfully requests that this Court: (1) vacate the CIT's decision affirming Commerce's *de facto* specificity determination and Tier 3 benchmark determination for the provision of natural gas for LTAR; (2) find that Commerce's

*de facto* specificity determination and Tier 3 benchmark determination for the provision of natural gas for LTAR were unsupported by substantial evidence and not in accordance with law; and (3) grant EuroChem such additional relief as the Court may deem just and proper.

Dated: August 7, 2024

Respectfully submitted,

*/s/ Jeremy W. Dutra*
Jeremy W. Dutra
jeremy.dutra@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

*Counsel for Industrial Group Phosphorite LLC*

FORM 19. Certificate of Compliance with Type-Volume Limitations                Form 19
                                                                               July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1593, 2024-1595

**Short Case Caption:** Mosaic Company v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 3,318 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/07/2024

Signature: /s/ Jeremy W. Dutra

Name: Jeremy W. Dutra

Save for Filing