# United States Court of Appeals for the Federal Circuit

---

**THE MOSAIC COMPANY,**
*Plaintiff-Appellee*

v.

**UNITED STATES,**
*Defendant-Appellee*

v.

**INDUSTRIAL GROUP PHOSPHORITE, LLC,**
*Defendant-Appellant*

**PHOSAGRO PJSC, JSC APATIT,**
*Defendants*

---

2024-1593

---

Appeal from the United States Court of International Trade in Nos. 1:21-cv-00117-JAR, 1:21-cv-00220-JAR, 1:21-cv-00221-JAR, Senior Judge Jane A. Restani.

---

Decided: December 5, 2025

---

DAVID J. ROSS, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, argued for plaintiff-appellee. Also represented by STEPHANIE HARTMANN.

Jeremy William Dutra, Squire Patton Boggs LLP, Washington, DC, argued for defendant-appellant.

Augustus Golden, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by Claudia Burke, Patricia M. McCarthy, Brett Shumate; Jared Michael Cynamon, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

_____

Before Prost, Reyna, and Chen, *Circuit Judges*.

Reyna, *Circuit Judge*.

This is an appeal from a judgment of the United States Court of International Trade, which affirmed the U.S. Department of Commerce's imposition of countervailing duties on certain imports of phosphate fertilizers from Russia. We affirm.

## Background

### I.

Where the production of goods exported to the United States benefited from subsidies bestowed by a foreign government, then the goods may be subject to a countervailing duty when imported into the United States. 19 U.S.C. § 1671. These duties "protect American firms from unfair competition by setting off the amount certain export subsidies foreign firms selling goods in the United States receive from their governments." *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1349 (Fed. Cir. 2006). For a subsidy to be countervailable, it must meet certain requirements, two of which are at issue in this appeal.

First, a subsidy is countervailable when it is "specific" to an enterprise or industry rather than generally available. 19 U.S.C. § 1677(5)(A). A subsidy can be specific as a

matter of law, also referred to as "de jure" specific, whereby the government legislates that a subsidy will apply specifically to an enterprise or industry. *Id.* § 1677(5A)(D)(i). A subsidy can also be specific as a matter of fact, also referred to as "de facto" specific. *Id.* § 1677(5A)(D)(iii). A subsidy may be de facto specific if one or more of the following factors exist:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II) An enterprise or industry is a predominant user of the subsidy.
>
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
>
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

*Id.* Relevant to this appeal is the "predominant user" factor. *Id.* § 1677(5A)(D)(iii)(II).

Second, a subsidy is countervailable when a foreign government provides a specific financial contribution to a party and that party benefits from the contribution. *See* 19 U.S.C. § 1677(5). One way that a party receives a benefit is through the provision of goods or services at "less than adequate remuneration" or "LTAR." 19 U.S.C. § 1677(5)(E)(iv).

Commerce uses a benchmark price to determine if the goods were sold at LTAR. *See* 19 C.F.R. § 351.511. Commerce follows a three-tiered hierarchy when determining the appropriate benchmark. *Id.* Under tier one, Commerce compares "the government price to a market-determined price for the good or service resulting from actual transactions in the country in question." *Id.* § 351.511(a)(2)(i). If

no such transactions exist, Commerce moves to tier two and compares "the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." *Id.* § 351.511(a)(2)(ii). If no world market price is available, Commerce moves to tier three and "assess[es] whether the government price is consistent with market principles." *Id.* § 351.511(a)(2)(iii).

II.

Appellee The Mosaic Company ("Mosaic") petitioned Commerce to initiate a countervailing duty investigation into whether the Russian government ("Russia") was providing countervailable subsidies to Russian producers and exporters of phosphate fertilizers. One of the alleged subsidies was the provision of natural gas at LTAR. On July 30, 2020, Commerce granted the petition, noting the period of investigation ("POI") was from January 1, 2019 to December 31, 2019. Commerce selected appellant Industrial Group Phosphorite, LLC, ("EuroChem") as a mandatory respondent. Commerce also selected PhosAgro PJSC ("PhosAgro"), who is not a party to this appeal, as a mandatory respondent.

As part of its investigation, Commerce issued questionnaires to Russia. First, Commerce broadly requested information about the "regulated prices for natural gas in Russia on a monthly basis during the POI." J.A. 1966. Russia responded by providing only "[r]egulated wholesale gas prices for *industrial consumers* on a monthly basis in 2019." J.A. 1972 (emphasis added).

Second, Commerce requested information about the consumption of natural gas in Russia. Russia responded that based on information provided by the Russian fertilizer industry, the Russian fertilizer industry accounted for 4.7% of Russia's total natural gas consumption in 2019. J.A. 1024. Commerce then requested Russia to "[p]rovide a detailed breakdown, by industry sector, of the volume

and value [for] consumption of natural gas in Russia during the POI . . . ." J.A. 1785. Russia responded that it "do[es] not maintain statistics on volume and value of natural gas consumption by industry sector," and instead relied on data from Gazprom. J.A. 1785–87. Gazprom is a government-controlled company and the largest supplier of natural gas in Russia. Russia provided a "Table 1," which displayed Gazprom's data on volumes of gas transported via its pipeline system during 2019. J.A. 1787. Table 1 is displayed below, along with Russia's explanation of the information displayed in the table. *Id.* The amounts consumed are confidential and thus have been redacted.[1]

According to the information provided by PJSC Gazprom, the volume of supply of gas produced by PJSC Gazprom and its affiliates, as well as gas purchased from independent producers, to consumers of the Russian Federation via the gas transmission system of PJSC Gazprom in 2019 was #

Table 1
(*in mln cubic meters*)

|  | # |
|---|---|
| Electricity | # |
| Oil industry | # |
| PJSC "Gazprom" (for own technological needs of the companies of the Gazprom Group) | # |
| Metallurgical industry | # |
| Agrochemical industry | # |
| Cement industry | # |
| Petrochemical industry | # |
| Automotive, tractor and agricultural engineering | # |
| Agro-industrial complex | # |
| Other industries | # |
| Communal Services | # |
| Households | # |

---

[1] This version of Table 1 is from appellee Mosaic's public response brief and displays Mosaic's removal of the confidential information. *See* Mosaic Response Br. 10. The groups displayed in Table 1 are not ordered in terms of amount of natural gas received.

Table 1 displays twelve groups and the redacted amount each group received of natural gas via Gazprom's pipeline system in 2019. *Id.* The agrochemical industry received the largest amount of natural gas amongst the groups which are categorized as an "industry," i.e., the oil industry, metallurgical industry, cement industry, and petrochemical industry. *Id.* The groups that received more natural gas than the agrochemical industry were electricity, "[o]ther industries," communal services, and households. *Id.* The remaining groups in Table 1, which each received less than the agrochemical industry, were Gazprom itself, "[a]utomotive, tractor and agricultural engineering," and "[a]gro-industrial complex." *Id.*

Aside from Table 1, Russia provided Commerce with other information concerning consumption of natural gas throughout Russia based on Gazprom's data. *See, e.g.*, J.A. 1785–86. This included Gazprom's annual report for 2016, which noted that, based on Russian law, "end consumers buy gas at regulated prices which are differentiated by consumer group (households vs industrial consumers)." J.A. 1977. The report explained that "[i]n 2016, wholesale gas prices for subsequent resale to household consumers were . . . lower than wholesale gas prices for industrial consumers." *Id.*

As part of Commerce's investigation, Mosaic, EuroChem, and PhosAgro each submitted to Commerce proposed benchmark data for determining whether the provision of natural gas was done at LTAR. EuroChem and PhosAgro jointly submitted benchmark prices for natural gas from independent Russian natural gas producers. J.A. 1668–1728; *see also* J.A. 1802–03. Mosaic submitted data from the International Energy Agency ("IEA") concerning the Organization for Economic Cooperation & Development and the European Union countries' natural gas prices (the "IEA data"). J.A. 1034–1667.

On November 30, 2020, Commerce preliminarily determined that the provision of natural gas by Russia was a countervailable subsidy. *See Phosphate Fertilizers from the Russian Federation*, 85 Fed. Reg. 76,524 (Dep't of Commerce Nov. 30, 2020); J.A. 1808; *see also* J.A. 1790. In so deciding, Commerce found that the subsidy was de facto specific because the agrochemical industry, which includes the fertilizer industry, was "a predominant user" pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(II). J.A. 1800–01. Based on the data displayed in Table 1, Commerce noted several points. First, it noted that "natural gas is heavily used in the agro-chemistry sector and [Table 1] indicates that agro-chemistry was in the top natural gas consuming groups for 2019." J.A. 1800. Second, Commerce noted that the "agrochemical industrial sector accounted for the largest percentage of total domestic natural gas sales among industrial groups for 2019." *Id.* Third, Commerce engaged in a comparison of natural gas usage between the agrochemical industry and "other industrial sectors." *Id.* Based on this comparison, Commerce concluded that the agrochemical industry is "a predominant user." J.A. 1800–01. Commerce noted that non-industrial sectors "such as households, electricity (utilities), and communal services" comprised "a combined majority percentage of total natural gas consumption." J.A. 1800.

Commerce also found that the provision of natural gas by Russia was done at LTAR by relying on Mosaic's IEA data as a third-tier benchmark. J.A. 1801. In arriving at this conclusion, Commerce first determined that there was no adequate benchmark under tier one, which looks at transaction prices in the country in question. J.A. 1801–02. Commerce rejected EuroChem's data based on the prices of a privately-owned Russian natural gas producer, Novatek, because those prices, along with the greater market for natural gas, were distorted through Russia's predominant role in the market via Gazprom. J.A. 1802.

Commerce next determined that there was no suitable benchmark of a world market price of natural gas for a tier two analysis. J.A. 1803. Specifically, Commerce rejected Mosaic's IEA data, which reflected European natural gas export prices, as a benchmark. *Id.* Commerce did so because the record indicated that European natural gas is not available for purchase in Russia, and thus, by extension those prices would not be available to purchasers in Russia. *Id.*

Commerce then turned to the tier three analysis, which asks whether the government price is consistent with market principles. J.A. 1804–06. Commerce determined that Gazprom's natural gas prices were not reflective of market principles. J.A. 1805. Commerce found that Gazprom sells its natural gas at regulated prices which are set to "ensure the strategic interests, defense capability and security of the state, protection of morality, health, rights and legitimate interests of citizens of the Russian Federation." J.A. 1804 (citation modified). Thus, Commerce concluded, Gazprom's prices are set based on the "government's social and economic development goals rather than market principles." *Id.* Commerce then determined that Mosaic's IEA data was an appropriate proxy for a tier three benchmark. J.A. 1805–06. Using that data, Commerce determined that the provision of natural gas was done at LTAR. J.A. 1806.

On February 8, 2021, Commerce made its final determination, once again concluding that the provision of natural gas by Russia was a countervailable subsidy. J.A. 1851–67. Commerce determined that the subsidy was de facto specific and that Mosaic's IEA data was an appropriate tier three benchmark. *See id.*

EuroChem appealed to the U.S. Court of International Trade ("Trade Court"), which sustained Commerce's de facto specificity and LTAR determinations. J.A. 15. The Trade Court remanded the case back to Commerce on issues not relevant to this appeal. J.A. 28–34. After multiple

redeterminations by Commerce and subsequent remands by the Trade Court, Commerce issued its final results on October 11, 2023. J.A. 2011–41. On January 19, 2024, the Trade Court sustained Commerce's final results, entering judgment in favor of Commerce. J.A. 73–74.

EuroChem appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

### STANDARD OF REVIEW

We review decisions of the Trade Court de novo and apply the same standard that the Trade Court applies in its review of Commerce's final countervailing duty determinations. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020). Under that standard, we uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.* (quotations omitted). We review questions of statutory interpretation de novo. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92 (2024). However, "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179–80 (2025). "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id.* at 180.

### DISCUSSION

Appellant challenges Commerce's de facto specificity and LTAR determinations. We address each in turn.

### I.

Appellant's de facto specificity challenge turns on the interpretation of "predominant user" at 19 U.S.C. § 1677(5A)(D)(iii)(II). *See* Appellant Br. 8–13; Reply Br. 2. According to appellant, when determining whether the

industry at issue is a "predominant user" of the subsidy, the statute requires Commerce to conduct a comparison of the industry at issue against all users of the subsidy. Appellant Br. 10. Appellant argues that Commerce's comparison of the agrochemical industry against industrial users, rather than all natural gas consumers within Russia, was thus contrary to law. *Id.* at 13. For the following reasons, we determine that under 19 U.S.C. § 1677(5A)(D)(iii)(II), Commerce has reasonable flexibility in selecting the comparator group for its predominant usage determination. No party disputes that if Commerce has such flexibility, then the agrochemical industry is "a predominant user" of the natural gas subsidy.[2]

We begin with the plain language of the statute. *Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1559 (Fed. Cir. 1988). The statute provides that, "[w]here there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if . . . [a]n enterprise or industry is a predominant user of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(II). This provision does not define "predominant user," nor does any other provision within the statutory framework. Contrary to appellant's position, this language cannot be interpreted as requiring Commerce to compare subsidy usage of an industry against all users of the subsidy. It does not prescribe any method that Commerce must employ when assessing whether an "enterprise or industry" is "a predominant user." *Id.* The plain text merely requires that "[a]n enterprise or industry is a predominant user of the subsidy." *Id.* Thus, we reject

---

[2] Indeed, appellant concedes that if the statute could be read to allow Commerce to compare predominant usage against "a group of enterprises or industries," i.e., a subset of users, then "Commerce's *de facto* specificity finding would be correct." Reply Br. 4 (emphasis in original).

appellant's overly narrow reading that Commerce must determine predominant usage based on a comparison of the subject industry's usage of the subsidy against all users of the subsidy.

Given that the plain language of the statute does not clarify what is a "predominant user of the subsidy," we turn to the legislative purpose of this provision. *See Johns-Manville*, 855 F.2d at 1560. Here, based on the Statement of Administrative Action ("SAA") to the Urugay Round Agreements Act, Congress clearly intended Commerce to have flexibility in determining predominant usage.[3] The SAA notes that the "specificity test," including de jure and de facto specificity, "was intended to function as a rule of reason" and as "an initial screening mechanism" to winnow out "subsidies which truly are *broadly available and widely used* throughout an economy," such as "public highways and bridges." SAA, H.R. Doc. No. 103-316, at 929 (1994) (emphasis added), reprinted in 1994 U.S.C.C.A.N. 4040. This is because "all governments . . . intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results," namely, "that almost every import entering the stream of American commerce [would] be countervailed." *Id.* at 929–30. Concerning de facto specificity, "Commerce [is to] seek and consider information relevant to all . . . [four] factors," including the predominant usage factor at 19 U.S.C. § 1677(5A)(D)(iii)(II). *Id.* at 931. As such, based on the SAA, we hold that under 19 U.S.C. § 1677(5A)(D)(iii)(II), Commerce has reasonable flexibility

---

[3] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreement and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

12                                              MOSAIC COMPANY v. US

in assessing predominant usage. *Loper Bright*, 603 U.S. at 395 (noting that statutes may "empower an agency . . . to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility" (citation modified)); *id.* (explaining that a reviewing court ensures that the agency has engaged in "reasoned decisionmaking" within the boundaries of authority Congress delegated to the agency).

Confirming our understanding of the statute is this court's clear and consistent position that Commerce has reasonable flexibility in carrying out the de facto specificity inquiry. For example, in *AK Steel Corp. v. United States*, this court explained that "[d]eterminations of . . . dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." 192 F.3d 1367, 1385 (Fed. Cir. 1999); *see also Gov't of Quebec v. United States*, 105 F.4th 1359, 1374 (Fed. Cir. 2024); *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335–36 (Fed. Cir. 2006). In *AK Steel*, the court relied on Commerce's 1998 notice of proposed rulemaking concerning the de facto specificity test, the rule which was eventually codified at 19 U.S.C. § 1677(5A)(D)(iii). As the court noted, Commerce stated that "the specificity test cannot be reduced to a precise mathematical formula" and "[i]nstead, the Department must exercise judgment and balance various factors in analyzing the facts of a particular case." *AK Steel*, 192 F.3d at 1385 (citing *Proposed Regulations*, 54 Fed. Reg. 23,366, 23,368 (Int'l Trade Admin. May 31, 1998)). Thus, under 19 U.S.C. § 1677(5A)(D)(iii)(II), Commerce has reasonable flexibility when determining predominant usage.

Appellant argues that such a reading would violate the very purpose of the de facto specificity test, which is to avoid imposition of countervailing duties on subsidies widely available and used in the subject country's economy. Reply Br. 5. Specifically, appellant argues that consumers of natural gas in Russia included "every aspect of the

economy," such as power generation, households, and industrial users. Appellant Br. 11–12. Appellant thus argues that Commerce's decision to limit the comparator group to only industrial users led to the very result that the de facto specificity test was meant to prevent, i.e., imposition of a countervailing duty on a subsidy widely available and widely used in the subject economy. Appellant Br. 11.

We reject appellant's position. Commerce has flexibility under 19 U.S.C. § 1677(5A)(D)(iii)(II) to determine the comparator group. But that flexibility is not unbounded, nor does it provide Commerce with a loophole for rendering all subsidies de facto specific. Rather, Commerce must engage in reasoned decision making. *Seven Cnty.*, 605 U.S. at 179–80; *Loper Bright*, 603 U.S. at 395; *Royal Thai*, 436 F.3d at 1336.

Here, Commerce's decision to limit the comparator group to industrial groups was sufficiently reasonable. The record shows that, while natural gas was consumed economy-wide, the regulated price of natural gas differed between industrial and non-industrial users. First, when Commerce broadly requested regulated natural gas prices, Russia only provided regulated gas prices based on "industrial consumers." J.A. 1972. This indicates that Russia understood there to be a difference between industrial and non-industrial users of natural gas. *See id.* Second, Gazprom noted in its 2016 annual report that "end consumers buy gas at regulated prices . . . differentiated by consumer group (households vs industrial consumers)." J.A. 1977. Thus, given the difference in Russia's treatment of pricing of natural gas between industrial and non-industrial users, it was within Commerce's reasonable discretion to limit its predominant usage analysis to only industrial users.

In sum, we hold that 19 U.S.C. § 1677(5A)(D)(iii)(II) does not mandate Commerce to compare the enterprise or industry at issue with all users of the subsidy but rather is authorized to exercise reasonable flexibility in determining

the comparator group under 19 U.S.C. § 1677(5A)(D)(iii)(II). We further determine that Commerce's predominant usage analysis was reasonable.

## II.

Appellant next argues that Commerce's determination that Russia's provision of natural gas was at LTAR was flawed in two respects. Appellant Br. 7. We address each in turn.

First, appellant argues that Commerce's LTAR analysis was flawed because Commerce should have first determined whether Gazprom's natural gas prices were set in accordance with market principles before relying on appellee's IEA data as a proxy tier three benchmark. Appellant Br. 7, 14. Appellant's argument fails. Commerce evaluated whether Gazprom's natural gas prices were based on market principles but concluded they were not due to government-created market distortions. J.A. 1804–05; J.A. 1863–64.

Appellant argues that Commerce may only consider "[g]overnment-created [market] distortion" when analyzing whether there is an appropriate tier one benchmark under 19 C.F.R. § 351.511(a)(2)(i). Appellant Br. 16. Not so. Consideration of government-created market distortion is not limited to a tier one analysis. 19 C.F.R. § 351.511(a)(2)(i)–(iii). Additionally, the tier three provision does not prohibit consideration of government-created market distortions but rather broadly notes that Commerce "will normally . . . assess[] whether the government price is consistent with market principles." *Id.* § 351.511(a)(2)(iii). The provision further provides that Commerce "*may* assess such factors as costs . . ., the government's price setting methodology, possible price discrimination, or a government price derived from actual sales from competitively run government auctions . . . ." *Id.* (emphasis added). That Commerce *may* assess certain factors does not limit its analysis to only those factors.

Thus, we reject appellant's position, which finds no support in the regulation.

Second, appellant argues that Commerce's LTAR determination is legally erroneous because Commerce failed to take steps allegedly required under 19 U.S.C. § 1677(5)(E)(iv). Appellant Br. 17–20. Specifically, appellant argues that the statute requires Commerce to adjust appellee Mosaic's IEA data to account for Russia's natural abundance of natural gas, and if no adjustment was necessary, explain why so. *Id.* at 17–18. We disagree.

The statute, 19 U.S.C. § 1677(5)(E)(iv), plainly does not require these two steps. The statute provides that when determining whether the subject good or service was provided for LTAR, "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv). The statute then notes that "[p]revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* Thus, Commerce's legal requirement is to broadly consider the adequacy of renumeration "in relation to prevailing market conditions for the good or service" at issue in subject country. *Id.* We reject appellant's attempt to read in specific requirements that find no support in the statute.[4]

---

[4] Additionally, any challenge to the reasonableness of Commerce's use of appellee Mosaic's IEA data, without any allegedly necessary adjustments, as a tier three benchmark is forfeited on appeal as insufficiently developed. *Arunachalam v. Int'l Bus. Machines Corp.*, 989 F.3d 988, 999 (Fed. Cir. 2021). "[M]erely stating disagreement with the trial court does not amount to a developed argument."

In sum, we determine that Commerce's LTAR determination is in accordance with the tier three framework at 19 C.F.R. § 351.511(a)(2)(iii) and with 19 U.S.C. § 1677(5)(E)(iv).

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. For the reasons discussed, we affirm the Trade Court's decision sustaining Commerce's countervailable duty determination.

## AFFIRMED

### COSTS

Costs against EuroChem.

---

*Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341 (Fed. Cir. 2006). As appellee United States notes, appellant fails to argue on appeal a specific adjustment and fails to identify useable data that it or any other respondent to Commerce's investigation placed on the record that would have allowed Commerce to adjust the IEA data. United States Response Br. 30. Thus, although appellant disagrees with Commerce's decision to use the IEA data without any adjustments, this mere disagreement is not a developed argument challenging the reasonableness of Commerce's action and, thus, is deemed forfeited.